**Kenneth R. GROVES and Peggy L. Groves, Plaintiffs-Appellants,**

v.

**UNITED STATES of America, Defendant-Appellee.**

**No. 74–4219.**

United States Court of Appeals, Fifth Circuit.

June 25, 1976.

H. Edward Moore, Jr., Larry Hill, Pensacola, Fla., for plaintiffs-appellants.

William H. Stafford, Jr., U. S. Atty., Pensacola, Fla., Scott P. Crampton, Asst. Atty. Gen., Tax Div., Dept. of Justice, Alfred S. Lombardi, Atty., Gilbert E. Andrews, Act-

ing Chief, App. Section, Dept. of Justice, Washington, D. C., for defendant-appellee.

Before BROWN, Chief Judge, and THORNBERRY, Circuit Judge, and MILLER,* Associate Judge.

MILLER, Associate Judge:

This appeal is from the judgment of the district court in favor of the United States, dismissing appellants' suit for refund of federal income taxes for the calendar years 1970 and 1971, which was based on disallowance of their claims for refund by the Internal Revenue Service. Appellants' earned income for the years involved consisted of salaries paid them by the Government of the Trust Territory of the Pacific Islands (GTTPI), and the ultimate question is whether, as appellants maintain, this income was excludable from gross income under subsection 911(a)(1) of the Internal Revenue Code of 1954 (I.R.C.), as amended (26 U.S.C. § 911(a)(1)).[1] This question turns on whether, as the district court held, the GTTPI is an "agency of the United States" for purposes of that subsection. We affirm.

*Facts*

There is no dispute that appellants meet the residence requirements of subsection 911(a)(1) for both 1970 and 1971. Pertinent stipulated and undisputed facts, as found by the district court, are as follows:

* Of the United States Court of Customs and Patent Appeals, sitting by designation.

1. Section 911 (as amended by section 11(a), Revenue Act of 1962, Pub.L.No.87–834, 76 Stat. 1003–04) provides in part as follows:
   § 911. *Earned income from sources without the United States*
   (a) General rule.—The following items shall not be included in gross income and shall be exempt from taxation under this subtitle:
   (1) *Bona fide resident of foreign country.*—In the case of an individual citizen of the United States who establishes to the satisfaction of the Secretary or his delegate that he has been a bona fide resident of a for-

Taxpayers, husband and wife, were both employed during the years involved as contract teachers by the GTTPI. The Trust Territory is a group of more than 2,000 islands and atolls situated in the Western Pacific Ocean. It includes the Northern Mariana Islands, the Eastern and Western Caroline Islands, and the Marshall Islands.[2] Between World War I and World War II the group was under control of Japan, which held a mandate over it under the old League of Nations. At the end of World War II, the group was under the military control of the United States, and this continued until the United Nations established a Trusteeship Council, which had jurisdiction over non-self-governing territories, including the Trust Territory of the Pacific Islands. Trusteeship agreements were entered into between the United Nations and those member nations which were in de facto control and possession of such territories. One of these agreements, effective July 18, 1947, was between the United Nations Security Council and the United States, which accepted administrative responsibility for the people of the Trust Territory of the Pacific Islands. Congress, by joint resolution, authorized the President to approve this agreement. Joint Resolution of July 18, 1947, ch. 271, 61 Stat. 397.

Under the Trusteeship Agreement, the United States, as the administering authority, was granted full powers of administration, legislation, and jurisdiction over the Trust Territory in order to promote the objectives of the United Nations, namely, the development of the economic, social,

eign country or countries for an uninterrupted period which includes an entire taxable year, amounts received from sources without the United States (except amounts paid by the United States or any agency thereof) which constitute earned income attributable to services performed during such uninterrupted period. The amount excluded under this paragraph for any taxable year shall be computed by applying the special rules contained in subsection (c).

2. The group is also known as "Micronesia." *Yearbook of the United Nations* 613 (1967 ed.) (United Nations Publication).

political and educational well-being of the people of the Trust Territory.[3] Administration of the trusteeship was vested in the President of the United States by section 1 of the Act of June 30, 1954, ch. 423, 68 Stat. 330 (48 U.S.C. § 1681(a)), wherein it was directed—

That until Congress shall further provide for the government of the Trust Territory of the Pacific Islands, all executive, legislative, and judicial authority necessary for the civil administration of the Trust Territory shall continue to be vested in such person or persons and shall be exercised in such manner and through such agency or agencies [4] as the President of the United States may direct or authorize.

Responsibility for administration of the Trust Territory was divided between the United States Department of Interior and the Department of the Navy until 1962, when President Kennedy by Executive Order No. 11021, 3 CFR 600 (1959–63 comp.), 48 U.S.C. § 1681, redelegated his authority for civil administration of the Trust Territory exclusively to the Secretary of the Interior. Pursuant to this authority, the Secretary of the Interior established the Trust Territory Government, which included legislative, judicial, and executive branches similar to the governmental organization of the United States. Department of Interior Order No. 2918.

The Executive Branch of the Trust Territory carries out its responsibilities through the High Commissioner of the Trust Territory. The High Commissioner is appointed by the President of the United States with the advice and consent of the Senate. Act of May 10, 1967, Pub.L.No.90–16, § 2, 81 Stat. 15 (48 U.S.C. § 1681a).

The legislature of the Trust Territory is known as the "Congress of Micronesia" and consists of two houses, the Senate and the House of Representatives. The legislative powers extend over all subjects of the islands except that these powers are limited in that they may not be inconsistent with treaties or international agreements of the United States, laws of the United States applicable to the Trust Territory, Executive Orders of the President of the United States, and orders of the Secretary of the Interior. The legislature has general legislative authority except as specifically restricted by the Secretary of the Interior. Department of Interior Order No. 2918, pt. III.

Every bill which is passed by the Congress of Micronesia has to be presented to the High Commissioner. If the High Commissioner should veto any bill, it is then returned to the Congress. If repassed over his veto, the High Commissioner, if he still does not approve of the bill, must send the bill, with his comments, to the Secretary of the Interior, who then shall either approve or disapprove of the bill regardless of the recommendations and action taken by the Congress of Micronesia.[5] Department of Interior Order No. 2918, pt. III, Section 13.

The judicial branch of the Trust Territory consists of the High Court for the Trust Territory and such other courts as may be established pursuant to law. The High Court consists presently of a Chief Justice and two Associate Justices, who are appointed by the Secretary of the Interior. Department of Interior Order No. 2918, pt. IV.

---

**3.** The Trusteeship Agreement provides that the United States shall "promote the development of the inhabitants of the trust territory toward self-government." Trusteeship Agreement for the former Japanese Mandated Islands, July 18, 1947, Art. 6(1), 61 Stat. 3302, T.I.A.S. No. 1665.

**4.** As of June 30, 1954, the person and "agency" exercising the authority were the Secretary of the Navy and the Navy Department with respect to the Northern Mariana Islands (except the Island of Rota) and the Secretary of the Interior and the Department of the Interior with respect to all of the remainder of the Trust Territory. Exec.Order No. 10470, July 17, 1953, 3 CFR 951 (1949–53 comp.).

**5.** No instance has been called to our attention where this has occurred. However, the High Commissioner has vetoed bills rather frequently. For example, in 1972, he approved 52 and vetoed 10. 26th Annual Report to the United Nations on the Administration of the Trust Territory of the Pacific Islands (1973).

Appellants, like other employees of the Trust Territory Government, are paid by checks drawn on the General Fund of the Trust Territory, which fund is composed of both United States grant funds and locally generated revenues. The Trust Territory Government has control of its Department of Education and the hiring of teachers and salaries paid them.[6] United States citizens employed by the Trust Territory Government are taxed by it, with the amount based on the gross income of the taxpayer.

### Preliminary Issues

■ Appellants argue that the trial court erred in denying their motion to compel the production of "any and all files of the Internal Revenue Service or any other United States Government files relating to Revenue Ruling 68–608 and the reasons for any rationale behind that ruling,"[7] stating that they relied upon the Federal Rules of Civil Procedure for purposes of discovery. The Government responds that since the sole issue to be decided is one of law, the facts having been stipulated, discovery was properly denied because the materials sought were not relevant, as required by Rule 26(b)(1), Fed.R.Civ.P. We agree.

■ Appellants also argue that the trial court erred in citing Revenue Ruling 68–608 and in according any weight to it, citing *Commissioner of Internal Revenue v. P. G. Lake, Inc.,* 356 U.S. 260, 78 S.Ct. 691, 2 L.Ed.2d 743 (1958). We note that the trial court stated that the ruling "is not controlling," although it added that "it is not without weight and is entitled to respectful consideration." We find no error, let alone prejudicial error, in the trial court's position. If anything the cited case supports the trial court by its reference to an admin-

istrative agency's "continuing rule-making power" (citing *Helvering v. Reynolds,* 313 U.S. 428, 432, 61 S.Ct. 971, 85 L.Ed. 1438 (1941)). *Id.* n. 5. In any event, the position the Government takes on the ruling in its brief should satisfy appellants:

> [It] is simply a published statement of the Commissioner's view that as a matter of law the Trust Territory Government is an agency of the United States within the intendment of Section 911 of the Code . . . . .

The Government does not argue that it was brought to the attention of the Congress and that successive revenue acts of the Congress leaving subsection 911(a)(1) unchanged constitute implied approval.

Citing Treas.Reg. § 1.911–2(a)(1) (1963), the Government states that for appellants' income to be excluded three tests must be satisfied: the amounts must be—

(i) from sources without the United States,

(ii) attributable to such uninterrupted period [which includes an entire taxable year], and

(iii) not paid by the United States or any agency or instrumentality thereof.

It then says (Br. at 13):

> It is uncontroverted here that the taxpayers meet the first two tests . . . . .

However, the Government calls attention to the fact that "well over ninety percent of all funds expended by the Trust Territory Government are provided by appropriations and grants from the United States" and incorporates a table in its brief showing that approximately 98% and 94%, respectively, for the years 1971 and 1972, represent the portion of such appropriations and grants. Nevertheless, we accept the Government's position that the amounts of

---

**6.** The Trust Territory School System is governed by the policies and standards of the Micronesia Board of Education and Trust Territory Code Title 41. The Trust Territory Code contains laws enacted by the Congress of Micronesia, a body elected by the Trust Territory citizens. The Board of Education is appointed

by the High Commissioner with the advice and consent of the Congress of Micronesia.

**7.** Rev.Rul. 68–608, 1968–2 Cum.Bull. 309, holds that employees of the Trust Territory Government who are citizens of the United States must include income received from that government in their gross income because they "are paid by 'the United States or any agency

income here involved were "from sources without the United States." [8]

Citing legislative history of the Revenue Acts of 1926 and 1932, the Government makes the following statement:

> The legislative history of Section 911 makes clear that the exemption from taxation was thought necessary by Congress to put citizens of this country trading in foreign countries on an equal footing with traders from other countries. Congress never intended that Section 911 would be used to exclude from federal taxation payments to citizens of this country . . . who do not compete in foreign commerce or further United States business interests.

However, a more comprehensive review of legislative history does not support that statement.

The original precursor of subsection 911(a)(1) [9] was subsection 213(b)(14) of the Revenue Act of 1926, ch. 27, 44 Stat. 26, which provided:

> (14) In the case of an individual citizen of the United States, a bona fide nonresident of the United States for more than six months during the taxable year, amounts received from sources without the United States if such amounts constitute earned income . . . but such individual shall not be allowed as a deduction from his gross income any deductions properly allocable to or chargeable against amounts excluded from gross income under this paragraph.

The purpose of this subjection was stated by the House Ways and Means Committee (H.R.Rep.No.1, 69th Cong., 1st Sess. 7 (1925)) in terms of foreign trade:

> In an endeavor to take one further step toward increasing our foreign trade it is recommended in this paragraph that there shall be excluded from gross income in the case of our *citizens employed abroad in selling our merchandise* amounts received as salary or commission for the sale for export of tangible personal property produced in the United States in respect of such sales made while they are actually employed outside the United States, if they are so employed for more than six months during a taxable year. [Emphasis added.]

Referring to this provision in the House-passed bill (H.R. 1), the Senate Finance Committee said (S.Rep.No.52, 69th Cong., 1st Sess. 20–21 (1926)):

> The committee sees no reason for such an exemption, inasmuch as a citizen so employed abroad, if required to pay any income tax to the foreign country on his salary, receives a credit against his United States tax of the amount of tax paid to the foreign country.

However, the House provision was restored by the Conference Committee. H.R.Rep. No.356, 69th Cong., 1st Sess. (Amend. No. 19) (1926).

This subsection became section 116(a) of the Revenue Act of 1932, ch. 209, 47 Stat. 204. It was contained in the House-passed bill (H.R. 10236), but was deleted by the Senate Finance Committee (S.Rep.No.665, 72d Cong., 1st Sess. 31 (1932)), which commented:

> Your committee believes there is no reason for the continuance of this exemption in the case of citizens of the United States residing abroad for the reason that under other sections of the act such citizens are granted a credit for income taxes paid foreign countries and should not be further relieved from Federal income taxes. Furthermore, a considerable proportion of the individuals previously benefited by this subsection have been employees of the United States who, because of their status as such, were usually exempt from any foreign tax upon their compensation received from the United

---

thereof' for the purpose of section 911 of the Code . . . ."

**8.** The Comptroller General has ruled that funds appropriated in the nature of unconditional grants to the Trust Territory, when paid to the Trust Territory Government and mingled with local revenues, lose their character as public funds. Op.Comp.Gen. June 11, 1957, B–131569.

**9.** See note 1 *supra*.

States; these citizens are not believed by your committee to be entitled to a complete exemption from the Federal income tax upon such compensation.

However, the Conference Committee restored the provision and, in response to the concern expressed by the Senate, inserted, without elaboration, the parenthetical matter "(except amounts paid by the United States or any agency thereof)." H.R.Rep. No.1492, 72d Cong., 1st Sess. (Amend. No. 59) (1932). During the Senate debate, Senator Reed had unsuccessfully sought to restore the provision deleted by the Finance Committee, but modified to include the parenthetical matter. He said (75 Cong.Rec. 10410 (1932)):

> In order to help our foreign trade and to put *all Americans who are working abroad* in a position of equality with their competitors, the Congress in several successive tax bills has exempted from our income taxes that part of the earnings of those Americans which was earned abroad, provided they lived abroad more than six months out of the year. [Emphasis added.]

The original precursor of subsection 911(a)(2) [10] was subsection 116(a)(2) of the Internal Revenue Code of 1939, as amended by section 148 of the Revenue Act of 1942, ch. 619, 56 Stat. 842. It provided an exclusion from taxable income as follows:

> (2) *Taxable year of change of residence to United States.*—In the case of an individual citizen of the United States, who has been a bona fide resident of a foreign country or countries for a period of at least two years before the date on which he changes his residence from such country to the United States, amounts received from sources without the United States (except amounts paid by the United States or any agency thereof), which are attributable to that part of such period of foreign residence before such date, if such amounts would constitute earned income as defined in section 25(a) if received from sources within the United States; but such individual shall not be allowed as a deduction from his gross income any deductions properly allocable to or chargeable against amounts excluded from gross income under this subsection.

It should be noted that this new subsection contained the identical parenthetical matter inserted in section 116(a) of the Revenue Act of 1932 which subsequently became section 116(a)(1) of the Internal Revenue Code of 1939. The House-passed bill (H.R. 7378) would have repealed section 116(a) outright. H.R.Rep.No.233, 77th Cong., 2d Sess. 93 (1942). However, the Senate Finance Committee, noting the proposed repeal and recognizing that abuses had occurred, said that outright repeal would work hardship. "For example, many employees of American business in South America do not return to the United States for periods of years. Such persons are fully subject to the income tax of the foreign country of their residence." It said that the provision (concerning length of residency) would eliminate abuse, but "will not unduly penalize our citizens who are bona fide residents of foreign countries." S.Rep.No.1631, 77th Cong., 2d Sess. 54 (1942). The Conference Committee adopted the Senate position. H.R.Rep.No.2586, 77th Cong., 2d Sess. (Amend. No. 128) (1942).

■ Section 321 of the Revenue Act of 1951, ch. 521, 65 Stat. 498, continued section 116(a), although the House-passed bill (H.R. 4473) had dropped it. In restoring it, the Senate Finance Committee (S.Rep.No.781, 82d Cong., 1st Sess. 52–53 (1951) U.S.Code Cong.& Admin.Service, p. 2023) said:

> Section 116(a) of the code exempts from income tax citizens of the United

---

10. The following exclusion from taxable income is provided by subsection 911(a)(2):

> (2) *Presence in foreign country for 17 months.*—In the case of an individual citizen of the United States who during any period of 18 consecutive months is present in a foreign country or countries during at least 510 full days in such period, amounts received from sources without the United States (except amounts paid by the United States or any agency thereof) which constitute earned income attributable to services performed during such 18-month period. . . . .

States who are bona fide residents of a foreign country with respect to income earned outside the United States, and disallows deductions chargeable against this income. This provision is intended both to encourage citizens to go abroad and to place them in an equal position with citizens of other countries going abroad who are not taxed by their own countries.

The Conference Committee adopted the Senate position. H.R.Rep.No.1213, 82d Cong., 1st Sess. (Amend. No. 55) (1951). Thus, the narrow purpose first expressed in 1926 of making our foreign traders located overseas competitive, taxwise, had been broadened by 1951 to making all citizens residing and earning income outside the United States competitive, taxwise. *See Swenson v. Thomas,* 164 F.2d 783, 784 (CA 5 1947). No subsequent change in this purpose has been brought to our attention, and, therefore, we conclude that appellants, earning their foreign source income as teachers, come within the legislative purpose, provided the amounts they received were not from an "agency" of the United States.

*Main Issue—"Agency" of the United States*

■ In determining the meaning of "agency" of the United States for purposes of subsection 911(a)(1), I.R.C., we are without guidance from the usual sources of legislative history—committee reports, hearings, and debates reported in the Congressional Record. However, our approach must follow the long-recognized rule that provisions granting tax exemptions are to be strictly construed. *Commissioner of Internal Revenue v. Jacobson,* 336 U.S. 28, 69 S.Ct. 358, 93 L.Ed. 477 (1949); *Lutkins v. United States,* 312 F.2d 803, 160 Ct.Cl. 648, cert. denied, 375 U.S. 825, 84 S.Ct. 65, 11 L.Ed.2d 57 (1963); *M. C. Parrish & Co. v. Commissioner of Internal Revenue,* 147 F.2d 284 (CA 5 1945). In the case of section 911, I.R.C., this means that the word "agency" is to be broadly construed, absent a contrary intent manifested by Congress, since a narrow construction thereof would be incompatible with a strict construction of the exemption.

*Webster's New International Dictionary of the English Language* (2d ed. 1939), which would indicate the common understanding of the meaning of the words at the time the identical parenthetical matter was included in subsection 116(a)(2) of the Internal Revenue Code of 1939 by the Revenue Act of 1942, discussed above, defined "agency" as follows:

1. Faculty or state of acting or of exerting power; . . . instrumentality.

2. Office or function of an agent, or factor; relation between a principal and his agent; business of one entrusted with the concerns of another. . . .

The word "instrumentality" was defined thus:

Quality or state of being instrumental; that which is instrumental; means; medium; agency.

The first Treasury Department regulation interpreting the above-referred-to parenthetical matter was § 29.116–1 of Income Tax Regulations 111, promulgated in 1943 and applicable to years beginning after December 31, 1941. It specified the tests to be met, including one substantially identical to test (iii) in the present regulation § 1.911–2(a)(1) (1963), namely:

such income does not represent amounts paid by the United States or any agency or instrumentality thereof.

Thus, "instrumentality" was equated with "agency," and the long-continued existence of this provision in successive regulations, without disapproval by Congress, indicates tacit approval of Congress thereof.

■ At the same time, since the United Nations was not established until 1945 and the Trusteeship Agreement involved here was not effectuated until 1947, it could hardly be said that the GTTPI was specifically contemplated by the Congress at the time of enactment of the Revenue Act of 1942. What can be said is that Congress contemplated an entity which is a means of carrying out a governmental function of

the United States. Construing "agency" or "instrumentality" broadly in such terms would encompass functions which fall within the responsibility of the United States, whether that responsibility and its correlative power derive from sovereignty or from a trusteeship agreement.[11] The substance of the functions under the Trusteeship Agreement involved here is underscored by the broad powers provided for by Article 3 of the Trusteeship Agreement:

> The administering authority shall have full powers of administration, legislation, and jurisdiction over the territory subject to the provisions of this agreement, and may apply to the trust territory, subject to any modifications which the administering authority may consider desirable, such of the laws of the United States as it may deem appropriate to local conditions and requirements.

■ It is correct, as appellants point out, that the Trusteeship Agreement provides (Art. 6.) that the administering authority shall "promote the development of the inhabitants of the trust territory toward self-government or independence, as may be appropriate to the particular circumstances of the trust territory and its peoples and the freely expressed wishes of the peoples concerned." However, that the end objective is specified by the Trusteeship Agreement and by Article 76(b) of the Charter of the United Nations [12] does not gainsay the fact that the United States, as administering authority, is carrying out a governmental function—discharging a responsibility—directed to attainment of that objective.[13]

Appellants argue that the employment of teachers is the responsibility jointly of the Director of the Department of Education and the Director of Personnel, and that the Trust Territory Government has sole control of the Department of Education and the hiring of teachers. This overlooks the fact that under Part III, Section 4, of the Trust Territory Code, requests for federal funds must be submitted to the Secretary of the Interior. He, in turn, must rely upon appropriations by the Congress. Considering the high percentage of the expenditures of the Trust Territory Government which comes from the United States as administering authority, it would be unrealistic to deny the existence of control over the Trust Territory Government and its system of education, granted that the "daily adminis-

11. We note the provision, quoted above, in the Act of June 30, 1954, that the civil administration of the Trust Territory "shall continue to be vested in such person or persons and shall be exercised in such manner and through such agency or agencies as the President of the United States may direct or authorize." The Trust Government, authorized by the Secretary of the Interior by delegated authority from the President, is clearly the "agency" through which the civil administration of the Trust Territory is exercised. This has been recognized by the High Court of the Trust Territory itself, which stated:

> Furthermore, the Trust Territory Government seems clearly intended to come within the meaning of the words "such agency or agencies as the President of the United States may direct or authorize" as used in 48 U.S.C. 1681(a) in providing for the government of the area.

*Alig v. Trust Territory,* 3 TTR 603, 612–13 (App.Div.1967).

12. Article 76, 59 Stat. 1048–49, T.S. 993, provides:

> The basic objectives of the trusteeship system, in accordance with the Purposes of the United Nations laid down in Article 1 of the present Charter, shall be:
>
> a. to further international peace and security;
>
> b. to promote the political, economic, social, and educational advancement of the inhabitants of the trust territories, and their progressive development towards self-government or independence as may be appropriate to the particular circumstances of each territory and its peoples and the freely expressed wishes of the peoples concerned, and as may be provided by the terms of each trusteeship agreement . . . .

13. It is to be noted that Article 15 of the Trusteeship Agreement states: "The terms of the present agreement shall not be altered, amended or terminated without the consent of the administering authority." The Trust Territory of the Pacific Islands is a "strategic area" (Art. 1, Trusteeship Agreement), and, therefore, functions of the United Nations with respect to it are exercised by the Security Council (Art. 83, Charter of the United Nations, 59 Stat. 1050), in which the United States possesses a veto (Art. 27, *id.* at 1041).

tration of the islands" has been "largely shifted into the hands of the local government." (Appellants' Br. 9.) [14]

Appellants rely on *People of Saipan v. United States Department of Interior,* 502 F.2d 90 (CA 9 1974), *cert. denied,* 420 U.S. 1003, 95 S.Ct. 1445, 43 L.Ed.2d 761 (1975), which affirmed the district court's conclusions that (a) the Trust Territory Government is not an "agency" for purposes of review under the Administrative Procedure Act (APA), 5 U.S.C. § 701 et seq., and (b) therefore it is not an "agency" for purposes of the National Environmental Policy Act, 42 U.S.C. § 4321 et seq. Although not a territory or possession (these are specifically excluded from the definition of "agency" under the APA), the Trust Territory Government was considered by the court to come within the intent of Congress "to exclude from APA review all governments of this general type created pursuant to the authority of Congress." The rationale of the court's position was stated as follows:

> This clear statement of intent on the part of the United Nations to foster self-government in the Trust Territory constrains us not to hold that the actions of the local government are reviewable in the same manner as the actions of domestic federal administrative agencies, in a federal district court several thousand miles from the islands.

The court also said:

> Plaintiffs have cited several judicial decisions, a regulation, and one Tax Court decision stating that the Trust Territory is not a territory or possession of the United States. However, the holding of the judicial decisions is limited to the applicability of the Federal Tort Claims Act (*see, e. g., Callas v. United States,*

253 F.2d 838 (2d Cir.), cert. denied, 357 U.S. 936, 78 S.Ct. 1384, 2 L.Ed.2d 1550 . . . and the regulation and the Tax Court decision both involve federal income taxation. . . . We do not read these decisions and the regulation to be inconsistent with our conclusion that Congress intended the government of the Trust Territory, like that of territories and possessions, to be immune from judicial review under the APA.

Thus, the court stated, in effect, that its position is not a precedent in cases involving other statutes, including particularly those relating to income taxation.

Appellants also rely on *Porter v. United States,* 496 F.2d 583, 204 Ct.Cl. 355 (1974), *cert. denied,* 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 761 (1975), which held that the Trust Territory Government was not an agency of the United States acting within the scope of its authority in entering into the contract in dispute, so that the United States was not bound as principal by the contract, which had been negotiated by officials of the Trust Territory Government. The court pointed out that the jurisdictional issue involved turned on privity of contract rather than statutory construction. We agree with the Government's contention that, as in the *People of Saipan* case, *Porter* cannot serve as precedent for interpreting a federal tax statute. Obviously it is not necessary that the Trust Territory Government have authority to bind the United States to a contract in order for it to be the means of carrying out a governmental function of the United States. *Cf. Standard Oil Co. v. Johnson,* 316 U.S. 481, 62 S.Ct. 1168, 86 L.Ed. 1611 (1942).

Relevant to interpretation of a tax statute is the opinion of the Court of Claims in

---

14. There is no basis here for applying the doctrine that substance governs over form. Apart from the role of Congressional appropriations, control over the Trust Territory Government provided for in the Trusteeship Agreement has been exercised on a continuing basis by the Secretary of the Interior. See, for example, Dept. of Interior Orders 2902, 32 Fed.Reg. 16058 (1967); 2918, 34 Fed.Reg. 157 (1968); 2969, 40 Fed.Reg. 811 (1975); 2973, 40 Fed. Reg. 17300 (1975); and 2989, 41 Fed.Reg. 15892 (1976). The Government argues: "There can be no doubt that the government of the Trust Territory could be dissolved pursuant to the authority of the United States." This overstates the case. Such a possibility is more theoretical than real. What matters is that the Trust Territory Government is the means of carrying out a governmental function of the United States.

*Morse v. United States,* 443 F.2d 1185, 195 Ct.Cl. 1 (1971), *cert. denied,* 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 455 (1972). The court held that the United States Employees Association of Tehran, Iran, which hired the taxpayer to serve as an assistant manager and which was organized under authority of State Department regulations to provide for its members and their dependents recreational activities and a source of food and other items at minimum prices, was an "agency" under subsection 911(a)(2), I.R.C. It quoted from *Donaldson v. Commissioner of Internal Revenue,* 51 T.C. 830, 840–41 (1969), which had held the American Embassy Cooperative Commissary in Karachi, Pakistan, to be an "agency," as follows:

> [T]he commissary was an agency of the United States. It was engaged in governmental rather than commercial functions, since its sole purpose was to contribute to the efficiency and convenience of the personnel of Government organizations with missions in Pakistan.

The Court of Claims emphasized the elements of control and effectuation of government purposes in identifying an "agency." *Accord, Kalinski v. Commissioner of Internal Revenue,* 528 F.2d 969 (CA 1 1976) (holding U. S. Air Force Europe Child Guidance Center an "agency" for purposes of subsection 911(a)(2), I.R.C.); *McComish v. Commissioner of Internal Revenue,* 64 T.C. 909 (1975), *appeal docketed,* No. 76–1486, 9th Cir., Feb. 12, 1976 (holding GTTPI an "agency" for purposes of subsection 911(a)(2), I.R.C.).

■ Appellants argue that the United States does not have sovereignty over the Trust Territory Government and that the Trust Territory Government not only has sovereignty to levy taxes but, in fact, does levy taxes. They cite *Domenech v. National City Bank,* 294 U.S. 199, 55 S.Ct. 366, 79 L.Ed. 857 (1935), which held invalid a tax imposed by Puerto Rico on branches of a New York national bank, saying "Puerto Rico, an island possession, like a territory, is an agency of the federal government, having no independent sovereignty comparable to that of a state in virtue of which taxes may be levied." They also cite *Bell v. Commissioner of Internal Revenue,* 278 F.2d 100 (CA 4 1960), which held that an American citizen who was an employee of the Government of American Samoa was an employee of an agency of the United States, noting that in 1900 the rulers of Samoa had ceded absolutely all sovereignty over the islands to the United States. They further cite *Davis v. Commissioner of Internal Revenue,* 30 T.C. 462 (1958), which, as noted by the court in *Bell,* involved an almost identical situation and which also held that the Government of American Samoa was an agency of the United States. These cases would be apposite if sovereignty were the touchstone of power and responsibility for carrying out a governmental function of the United States. However, we have already concluded that it is not.[15]

In view of the foregoing, we hold that the Government of the Trust Territory of the Pacific Islands is an agency of the United States for purposes of subsection 911(a)(1), I.R.C. Thus appellants' earned income was not excludable from gross income.

The judgment below is affirmed.

---

**15.** We note that in *Bell* the Fourth Circuit quoted from *Lassiter v. Guy F. Atkinson Co.,* 176 F.2d 984, 991 (CA 9 1949) as follows:

> The authority to act with the sanction of government behind it determines whether or not a governmental agency exists. The form the agency takes, or the function it performs are not determinative.