**John D. McCOMISH and Genevieve A. McComish, Petitioners-Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

No. 76–1486.

United States Court of Appeals, Ninth Circuit.

Aug. 28, 1978.

John D. McComish, pro se.

Russell W. Walker (argued), of Walker & Gann, Escondido, Cal., for petitioners-appellants.

David E. Carmack (argued), of Dept. of Justice, Washington, D.C., for respondent-appellee.

Before ANDERSON and HUG, Circuit Judges, and MUECKE, District Judge.*

J. BLAINE ANDERSON, Circuit Judge:

Under section 911(a)(2) of the Internal Revenue Code, United States citizens who reside in foreign countries for more than 17 months need not pay income tax on foreign-source income, provided the income is not received from the United States or a United States agency. The question presented in this case is whether the Taxpayers, Mr. and Mrs. McComish, can benefit from the exclusion provided by section 911(a)(2).

John D. McComish, a United States citizen, was employed during 1967 and 1968 as the District Attorney of the government of the Trust Territory of the Pacific Islands (hereinafter "Trust Territory"). His wife, who also resided in the Territory, was employed in a private capacity. In 1968, the Taxpayers filed a joint return with the Internal Revenue Service, excluding their

* Honorable Carl A. Muecke, United States District Judge, District of Arizona, sitting by designation.

salaries earned in the Trust Territory from their computation of income.

The Commissioner asserted a deficiency against the Taxpayers in the amount of $2,810.45. After paying this amount, the Taxpayers brought suit in the Tax Court for a refund.[1] The Tax Court upheld the Commissioner's determination that Mr. McComish's salary constituted taxable income, concluding that the Trust Territory of the Pacific Islands is a United States agency under section 911(a)(2) of the Code. *McComish v. Commissioner*, 64 T.C. 909 (1975). We reverse.

The Trust Territory government hired McComish in 1967 to be its District Attorney and assume responsibility for all government-related civil litigation. McComish's salary was paid by the Trust Territory from funds drawn on its bank account, comprised of revenues from the United States and local tax revenues.

The Trust Territory of the Pacific Islands, also known as Micronesia, is composed of over 2,000 islands including the

Northern Mariana Islands, the Eastern and Western Caroline Islands, and the Marshall Islands. The islands have been ruled by a succession of foreign interests.[2]

The Taxpayers raise two issues on appeal: (1) whether the Trust Territory of the Pacific Islands is an agency of the United States under section 911(a)(2) of the Internal Revenue Code; and (2) whether the Tax Court abused its discretion in failing to allow the petitioner to take the deposition of the Commissioner of Internal Revenue and in failing to compel discovery of the tax records of other taxpayers who were employed by the Trust Territory. Because we agree with the Taxpayers on the first issue, we find it unnecessary to reach the second.

I.

Section 911(a) of the Internal Revenue Code provides that under certain circumstances an individual citizen of the United States who resides in a foreign country may exclude from his gross income amounts he receives from sources without the United States.[3] The taxpayers' claim is under

1. The Internal Revenue Service conceded that Mrs. McComish's salary, which was paid by a private corporation, was exempt under section 911(a)(2).

2. After several centuries of Spanish rule, the islands were sold to Germany in 1899. With the advent of World War I, however, the islands fell into Japanese control. The League of Nations officially recognized Japan's possession of the islands and in 1919, following the peace conference, the islands were mandated to Japan under a "C" mandate, a part of the League system for governing occupied territories. Although the League recognized that Japan would have administrative control over the islands, the mandate imposed certain limits upon Japan's power to govern. Specifically, the League of Nations Covenant art. 22, para. 1 defined the nature of the trustee relationship as follows: "To those colonies and territories which . . . are inhabited by peoples not yet able to stand by themselves . . . there should be applied the principle that the well-being and development of such peoples form a sacred trust of civilization." The mandatory, in this case Japan, had to guarantee "freedom of conscience and religion subject to the maintenance of public law and morals, the prohibition of the slave trade, the arms traffic and the liquor traffic, and the prevention of fortifications and military training among the natives." *Id.* In particular the "C" mandates were to be

administered "under the laws of the Mandatory . . . [but] subject to the safeguards above mentioned in the interest of the indigenous population." *Id.*

During 1919 and 1920, the Supreme Council of the Principle Allied Powers assigned specific mandates. The Council of the League of Nations approved the terms of each mandate under its authority to define explicitly in each case "the degree of authority, control, or administration to be exercised by the Mandatory." *Id.*

For a discussion of the mandates system established by the League of Nations, see Sayre, *Legal Problems Arising from the United Nations Trusteeship System*, 42 Am.J.Int'l L. 263 (1948).

3. Treas.Reg. § 1.911–2(a)(1) (1963) provides:
[A]mounts constituting earned income . . . shall be excluded from the gross income of an individual citizen of the United States who establishes to the satisfaction of the Commissioner that he has been a bona fide resident of a foreign country or countries for an uninterrupted period which includes an entire taxable year, if such amounts are (i) from sources without the United States, (ii) attributable to such uninterrupted period, and (iii) not paid by the United States or any agency or instrumentality thereof.

§ 911(a)(2) of the Internal Revenue Code, which excludes from gross income:

> [i]n the case of an individual citizen of the United States who during any period of 18 consecutive months is present in a foreign country or countries during at least 510 full days in such period, amounts received from sources without the United States (*except amounts paid by the United States or any agency thereof*) which constitute earned income attributable to services performed during such 18-month period.

I.R.C. § 911(a)(2) (emphasis added).

The Commissioner concedes that the Taxpayers are entitled to the exclusion if the Trust Territory government is not a United States agency. Although the Code does not contain a definition of "agency," the applicable regulation equates "agency" and "instrumentality." Our review of the legislative history of section 911 persuades us that the Taxpayers here can benefit from the exemption and that the "agency" exception does not apply.

Subsections (a)(1)[4] and (a)(2) of section 911 require the payment of income taxes on amounts paid by a United States agency. The legislative history concerning subsection (a)(1) provides guidance for the proper construction of subsection (a)(2).

The precursor of subsection 911(a)(1) was section 116(a) of the Revenue Act of 1932, ch. 20, 47 Stat. 204. The portion of the bill containing section 116(a) was passed by the House but was rejected by the Senate Finance Committee, which stated:

> Your committee believes there is no reason for the continuance of this exemption in the case of citizens of the United States residing abroad for the reason that under other sections of the act such citizens are granted a credit for income taxes paid foreign countries and should not

be further relieved from Federal income taxes. Furthermore, a considerable proportion of the individuals previously benefited by this subsection have been employees of the United States who, because of their status as such, were usually exempt from any foreign tax upon their compensation received from the United States; these citizens are not believed by your committee to be entitled to a complete exemption from the Federal income tax upon such compensation.

S.Rep.No. 665, 72d Cong., 1st Sess. 31 (1932).

The Conference Committee restored the exemption for citizens residing outside the country but added the proviso "except amounts paid by the United States or any agency thereof." H.R.Rep.No. 1492, 72d Cong., 1st Sess. (1932). Although the Conference Committee did not explain the insertion, the exception apparently reflected the concern, expressed by the Senate Committee, that United States employees who were living abroad did not have to pay tax in foreign countries, yet would be exempt from American taxation.

The precursor of subsection 911(a)(2) was subsection 116(a) of the Internal Revenue Code of 1939, ch. 619, 56 Stat. 842 (1941). The section excluded from taxable income:

> [i]n the case of an individual citizen of the United States, who has been a bona fide resident of a foreign country or countries for a period of at least two years before the date on which he changes his residence from such country to the United States, amounts received from sources without the United States (*except amounts paid by the United States or any agency thereof*), which are attributable to that part of such period of foreign residence before such date, if such amounts would constitute earned in-

---

As we show later, our decision is unaffected whether we use the term agency or the term instrumentality.

4. I.R.C. § 911(a)(1) reads in pertinent part:

> In the case of an individual citizen of the United States who establishes to the satisfaction of the Secretary or his delegate that he has been a bona fide resident of a foreign

country or countries for an uninterrupted period which includes an entire taxable year, amounts received from sources without the United States (*except amounts paid by the United States or any agency thereof*) which constitute earned income attributable to services performed during such uninterrupted period.

(Emphasis added.)

come . . . from sources within the United States; but such individual shall not be allowed as a deduction from his gross income any deductions properly allocable to or chargeable against amounts excluded from gross income under this subsection.

(Emphasis added.)

The subsection contained the same phrase, "except amounts paid by the United States or any agency thereof," that the Conference Committee had inserted in section 116(a) of the Revenue Act of 1932.

Subsequently, the House passed a bill that would have repealed section 116(a). H.R. 7378, 77th Cong., 2d Sess. (1942). The Senate Finance Committee refused to adopt the position of the House, stating that:

> For example, many employees of American business in South America do not return to the United States for periods of years. Such persons are fully subject to the income tax of the foreign country of their residence.

S.Rep.No. 1631, 77th Cong., 2d Sess. 54 (1942). The Conference Committee adopted the Senate position. H.R.Rep.No. 2586, 77th Cong., 2d Sess. (1942). Almost 20 years later, section 321 of the Revenue Act of 1951 carried forward the exemption first enacted in section 116(a) despite the fact that the House had attempted to drop it. *See* H.R.Rep.No. 4473, 82d Cong., 1st Sess. (1951). The Senate Finance Committee had again restored the section, stating:

> Section 116(a) of the code exempts from income tax citizens of the United States who are bona fide residents of a foreign country with respect to income earned outside the United States, and disallows deductions chargeable against this income. This provision is intended both to encourage citizens to go abroad and to place them in an equal position with citizens of other countries going abroad who are not taxed by their own countries.

S.Rep.No. 781, 82d Cong., 1st Sess. 52–53 (1951) U.S.Code Cong. & Admin.Serv. 1951, pp. 1781, 2023. The Conference Committee again adopted the Senate position. H.R. Rep.No. 1213, 82d Cong., 1st Sess. (1951).

The purpose of section 116(a) was to place Americans who reside and work outside the United States in an equal taxpaying position with citizens of other foreign countries and to encourage United States citizens to go abroad to provide technical expertise. Section 911(a)(2) of the current Code undoubtedly serves the same purpose. It is clear that Mr. McComish falls within the purpose of the section; the Government concedes that he went abroad to provide expertise to a foreign country.[5]

It is also clear that the exception for employees of the United States or any agency thereof was designed to prevent United States government employees from obtaining a windfall under subsections 911(a)(1) or 911(a)(2).

When section 911(a)(2) was enacted, the Trust Territory was not in existence and thus there is no indication that Congress intended the "agency" exception to apply to Trust Territory employees. It seems, however, that the drafters used the "agency" exception to prevent a windfall to United States "agency" employees who did not have to pay tax in certain foreign countries by virtue of their status as United States employees.

Although McComish did not have to pay tax to the Trust Territory while he was a Trust Territory employee, this was not because his status was that of a United States employee, but because the Trust Territory did not have an income tax during his tenure of employment. Had McComish been employed by the Trust Territory after 1971, when it passed its income tax statute, he would have had to pay income taxes to the Trust Territory. Thus, McComish was not one of those United States employees who would have reaped windfall benefits in the absence of the agency exception.

---

5. In *Groves v. United States*, 533 F.2d 1376 (5th Cir. 1976), *cert. denied*, 429 U.S. 1000, 97 S.Ct. 529, 50 L.Ed.2d 611 (1977), the court found that teachers employed by the Trust Territory fell within the exemptive purpose of section 911(a)(2). Nevertheless, the court held that the "agency" exception operated to deny them the exemption. *Id.* at 1383.

For these reasons, we are convinced that even when we apply the well-known principle that an exemption to the Code should be construed strictly, *Hanover Bank v. Commissioner of Internal Revenue*, 369 U.S. 687, 82 S.Ct.. 1080, 8 L.Ed.2d 187 (1962), our conclusion that the Trust Territory of the Pacific Islands is not a United States agency accords with the legislative intent of the drafters of section 911(a)(2).

## II.

The Commissioner and some courts have construed the statutory language to mean that an entity is a United States agency if it is "controlled" by the United States. The definition of "control," however, has varied. In *Kalinski v. Commissioner*, 528 F.2d 969 (1st Cir. 1976), the court held that a United States Air Force Child Guidance Center was an "agency." The court determined that "control" was present because the Air Force set up the center to meet Air Force needs, because the center was operated and monitored under an official Air Force program, and because the Air Force regulated the Center's budget and price list. In *Morse v. United States*, 443 F.2d 1185, 195 Ct.Cl. 1 (1971), *cert. denied*, 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 455 (1972), the court held the United States Employees Association of Tehran to be an "agency" under section 911 and stated:

> The elements of control, with the power to initiate and terminate, with effectuation of Government purposes paramount over those of the organizers and members, the exclusion of private profit, and the limitation of membership to Government-connected persons serve to identify an "agency."

*Id.* at 1188.

Thus, under the control test that the Commissioner espouses, where an entity is

designed primarily to perform a function for the United States government, where the entity was formed or hired by the United States government, and where it can be terminated by the United States government, the entity is probably an "agency" under section 911(a)(2).[6]

*Kalinski* and *Morse* are distinguishable, however, from the case on appeal because they involved private companies and not a foreign governmental entity.[7] Moreover, not only is the entity here a foreign country, but United States authority over that country is severely limited.

Despite the distinctions, the Commissioner used the control test to determine that the Trust Territory government was a United States agency:

> In view of the control exercised by the Secretary of the Interior or his representatives over the Government of the Trust Territory of the Pacific Islands, United States citizens employed by the government are paid by "the United States or any agency thereof" for the purpose of section 911 of the Code, whether they are Civil Service employees or contract employees who are outside the Civil Service system.

Rev.Rul. 68–608, 1968–2 C.B. 309.

The Fifth Circuit applied the same test in *Groves v. United States*, 533 F.2d 1376 (5th Cir. 1976), *cert. denied*, 429 U.S. 1000, 97 S.Ct. 529, 50 L.Ed.2d 611 (1977), and held that the appellants, teachers employed by the Trust Territory government, were employees of a United States agency. The *Groves* court looked to the elements of control and the effectuation of governmental policy as the primary factors by which they determined that the Trust Territory government was a United States agency. The court stated, at page 1384–85:

---

6. *See, e. g., Donaldson v. Commissioner*, 51 T.C. 830 (1969) (American Embassy Cooperative Commissary in Pakistan held to be agency of the United States under section 911); *Dowd v. Commissioner*, 37 T.C. 399 (1961) (United States Educational Commission in Japan); *Teskey v. Commissioner*, 30 T.C. 456 (1958) (private shipping firm operating United States owned ship in the Far East pursuant to contractual arrangement).

7. In *Bell v. Commissioner of Internal Revenue*, 278 F.2d 100 (4th Cir. 1960), the court held that American Samoa was a United States agency for purposes of section 911. *Bell* is distinguishable from the present case, however, because the taxpayer in *Bell* was an employee of the United States and because, unlike the Trust Territory, American Samoa is a United States possession.

"Considering the high percentage of the expenditures of the Trust Territory government which comes from the United States as the administering authority, it would be unrealistic to deny the existence of control over the Trust Territory government and its system of education . . . ."

We do not agree with this analysis. The mere "high percentage of expenditures" coming from the administering authority does not, when balanced with the other considerations discussed in this opinion, constitute the Trust Territory government as an agency of the United States. The Supreme Court has specifically recognized that merely funding an entity does not mean the federal government controls that entity. In *United States v. Orleans*, 425 U.S. 807, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1975), the Supreme Court held that a community action agency funded entirely under the Economic Opportunity Act of 1964 was not an instrumentality or agency of the federal government, for purposes of Federal Tort Claims Act liability. The court stated at page 816, 96 S.Ct. at page 1977:

"The federal government in no sense controls 'the detailed physical performance' of all of the programs and projects it finances by gifts, grants, contracts or loans."

Although we recognize that the question is a complex one, we disagree with the result of the *Groves* case and hold that the Trust Territory is *not* an agency of the United States, for the purposes of § 911(a)(2) of the Internal Revenue Code.

### III.

In order to determine whether the elements of the control test have been met and whether the Trust Territory is an agency under section 911(a)(2) we must examine both the international agreement under which the Trust Territory was created and the administrative operation of the Trust Territory by the United States.

### International Agreement

The United States obtained military control of some of the islands in World War II. After the war, the United Nations obtained jurisdiction over the islands under a Trusteeship Council designed to control non-self-governing territories. On July 18, 1947, pursuant to an agreement with the United Nations Security Council, the United States became the administering authority for the Territory. H.R.J.Res. 233, 80th Cong., 1st Sess., 61 Stat. 397 (1947).

Under the Trusteeship Agreement, the United States, as administering authority, has "full power of administration, legislation, and jurisdiction over the territory *subject to the provisions of this agreement.*" Trusteeship Agreement for the Former Japanese Mandated Islands, art. 3, 80th Cong., 1st Sess., 61 Stat. 3301 (1947) (emphasis added).

The United States is directed under article 6 of the Agreement to

*foster the development of such political institutions as are suited to the trust territory and shall promote the development of the inhabitants of the trust territory toward self-government or independence* as may be appropriate to the particular circumstances of the trust territory and its people and the freely expressed wishes of the peoples concerned; and to this end shall give to the inhabitants of the trust territory a progressively increasing share in the administrative services in the territory . . . [and] give due recognition to the customs of the inhabitants in providing a system of law for the territory; and shall take other appropriate measures toward these ends . . . .

(Emphasis added.)

Under article 4 of the Agreement, the administering authority's power is limited still further. The administering authority must conduct itself in accordance with the principles contained in articles 76 and 83(2) of the United Nations Charter. Article 76 specifies that the basic objectives of the trusteeship system are, among others:

to further international peace and security . . . to promote the political, economic, social, and educational advancement of the inhabitants of the trust territories, and their progressive development towards self-government or inde-

pendence as may be appropriate to the particular circumstances of each territory . . . . to encourage respect for human rights and for fundamental freedoms for all without distinction as to race, sex, language, or religion . . . .

U.N. Charter, art. 76, para. 2–4.

In recognition that the power of the administering authorities is limited, the International Court of Justice has held that the Union of South Africa was not competent to modify the trusteeship status of the Territory of South Africa without the consent of the United Nations. International Court of Justice, *Reports of Judgments, Advisory Opinions and Orders. International Status of South West Africa. Advisory Opinion of July 11th, 1950, discussed in* [1950] U.N.Y.B. 806. By parity of reasoning, it appears that the United States cannot alter the trusteeship status of the Trust Territory without United Nations consent. The power of the administering authority is further limited under article 88 of the Charter, which entitles the Trusteeship Council to make periodic inspections of the Trust Territories and to examine petitions and to submit questionnaires to the administering authorities.

*Administration of the Trust Territory*

Pursuant to legislation passed in 1954, the authority for governing the Trust Territory rests with the President of the United States. Act of June 30, 1954, § 1, 48 U.S.C. § 1681(a) (1970). Until 1962, responsibility for administration of the Trust Territory was divided between the Department of the Navy and the Department of the Interior. Exec. Order No. 10,470, 3 C.F.R. 951 (1949–1953 Compilation). In 1962 the President designated the Department of the Interior as being solely responsible for the administration of the islands. Under the terms of the Executive Order, the Secretary of the Interior was authorized to:

take such actions as may be necessary and appropriate to carry out the obligations assumed by the United States as the administering authority of the Trust Territory under the terms of the trusteeship agreement and under the Charter of the United Nations . . . .

Exec. Order No. 11,021, 3 C.F.R. 600 (1959–1963 Compilation), *reprinted in* 48 U.S.C. § 1681 (1970). Pursuant to this authority, the Secretary established the Trust Territory government, which is comprised of executive, legislative, and judicial branches that operate similarly to the government of the United States. Department of Interior Order No. 2918 (Nov. 15, 1967).

The executive branch of the Trust Territory government is headed by the High Commissioner, who is appointed by the President with the advice and consent of the Senate. Act of May 10, 1967, § 2, 48 U.S.C. § 1681a (1970).

The legislature of the Trust Territory, the Congress of Micronesia, is composed of two houses, the Senate and the House of Representatives. The Congress of Micronesia, whose members are elected, has plenary legislative power over all subjects of the islands except that the Congress may not legislate inconsistently with the treaties or international agreements of the United States, the laws of the United States applicable to the Trust Territory, Executive Orders of the President of the United States, and Orders of the Secretary of the Interior. Department of Interior Order No. 2918, pt. III, § 2 (Nov. 15, 1967).

The judicial branch of the Trust Territory consists of the High Court and "such other courts as may be established pursuant to law." *Id.*, pt. IV. At the present time, there are district courts in the Territory. The Chief Justice and the two Associate Justices of the High Court are appointed by the Secretary of the Interior. All other employees of the judicial branch are hired by the Trust Territory government. *Id.*

The funds for paying Trust Territory employee salaries are composed of a combination of funds from United States revenues and local government revenues. To raise funds, on February 12, 1971 the Congress of Micronesia enacted Public Law 4C–2, an income tax act that imposes an income tax on residents of the Trust Territory, including all United States citizens except United States military employees. 77 Trust Territory Code § 251 (Cum.Supp.1971).

The status of the Trust Territory is currently in a state of flux. In March of 1971, the President of the United States appointed an ambassador to be the President's personal representative at negotiations concerning the future status of the Trust Territory.

Sovereignty of the Trust Territory does not rest with the United States. See Sayre, *Legal Problems Arising from the United Nations Trusteeship System*, 42 Am.J. Int'l L. 263, 268–72 (1948). Because the Trust Territory is a trusteeship the United States cannot dissolve it as an entity or change its trusteeship status without the consent of the Trusteeship Council. More importantly, the United States is charged under the terms of the Trusteeship Agreement with fostering self-government in the Trust Territory.

Thus, the structure of the Trust Territory, while administered to some degree by the United States, is nevertheless a distinct entity and not merely a United States agency. It is this "quasi-sovereign" status of the Trust Territory that leads to our determination that the control test has not been met.

### IV.

The constraints placed on the United States in its role as trustee for the Trust Territory have been recognized by at least two courts that have determined that the Trust Territory is not a United States agency. Although these cases did not involve the definition of agency under section 911(a)(2), we find that the underlying rationale of each case supports our conclusion.

In *People of Saipan v. Department of the Interior*, 502 F.2d 90 (9th Cir.), *cert. denied*, 420 U.S. 1003, 95 S.Ct. 1445, 43 L.Ed.2d 761 (1974), this Court upheld the district court's determination that the Trust Territory government is not a federal administrative agency subject to judicial review under the Administrative Procedures Act.[8] The

Court premised its holdings on the fact that the government of the Trust Territory is a separate operative government and specifically stated:

This clear statement on the part of the United Nations to foster self-government in the Trust Territory constrains us not to hold that the actions of the local government are reviewable in the same manner as the actions of domestic federal administrative agencies.

*Id.* at 95.

In his concurring opinion Judge Trask recognized that the High Court of the Trust Territory was a separate judicial system with an independent constitutional basis and, as such, was entitled to comity by United States courts. Thus, the underlying basis for the concurring opinion was that the Trust Territory government was a sovereign entity.

We find additional support for the proposition that the Trust Territory is not a United States agency in *Porter v. United States*, 496 F.2d 583, 204 Ct.Cl. 355, *cert. denied*, 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 761 (1974). In *Porter* the court held that the United States was not bound by a contract entered into by officials of the Trust Territory government because there was no agency relationship. In support of its decision, the court cited an opinion letter of the Comptroller General of the United States which stated that the Trust Territory government could not use a "federal transportation request to defray official travel expenses of its employees since 'none of the territorial governments, including the Government of the Trust Territory, are regarded as Federal agencies or instrumentalities.'" *Id.* at 589 (citing Comptroller General's Opinion B–1311569 of June 11, 1957).

In addition to the above-cited cases, the Solicitor General of the United States Department of the Interior rendered a similar

---

**8.** The Commissioner, although recognizing that the Trust Territory is a foreign country, Rev. Rul. 73–46, 1973–1 C.B. 342; Rev.Rule 68–608, 1968–2 C.B. 309, has held that the Trust Territory government is a United States agency. Rev.Rul. 73–46, 1973–1 C.B. 342.

The Court in *Saipan*, by holding that the Trust Territory government was not a United States agency, undermines the Commissioner's position, albeit in a somewhat different context.

decision in an opinion letter to Senator Henry Jackson, Chairman of the Senate Committee on Interior and Insular Affairs. The Solicitor General stated that the Trust Territory "is not an agency or instrumentality of the Federal Government, but is a separate and distinct legal entity. . ." Opinion Letter from Solicitor Frizzel to Senator Jackson (Jan. 14, 1975).

Numerous cases establish that the Trust Territory is a foreign country. *See, e. g., Callas v. United States,* 253 F.2d 838 (2d Cir. 1958) (Federal Tort Claims Act); *Adranas v. Hogan,* 155 F.Supp. 546 (D.Hawaii 1957) (Immigration); *Brunnell v. United States,* 77 F.Supp. 68 (S.D.N.Y.1948) (Federal Tort Claims Act).

## V.

Finally, to hold that the Trust Territory is a United States agency would lead to an inequitable result as applied to McComish. McComish was not a United States government employee. He did not receive any benefits from the United States as a result of his status as a Trust Territory employee. He did not receive federal retirement or social security benefits, he received no federally funded sickness or disability benefits, and he did not qualify as an employee under the Federal Tort Claims Act. Consequently, if this Court were to hold that the government of the Trust Territory was a United States agency, we would be placed in the untenable position of requiring McComish to pay taxes as if he were a United States government employee, when he has received none of the benefits accorded to United States government employees.

Accordingly, the judgment of the Tax Court is reversed.