143 T.C. No. 1

UNITED STATES TAX COURT

GUARDIAN INDUSTRIES CORP., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 20755-12.                          Filed July 17, 2014.

I.R.C. section 162(f) denies a deduction for "any fine or similar penalty paid to a government for the violation of any law." Section 1.162-21(a), Income Tax Regs., provides that the term "government" includes a "corporation or other entity serving as an agency or instrumentality" of a domestic or foreign government.

In 2008 P, a U.S. corporation, paid a fine to the Commission of the European Community (Commission) for participating in a price-fixing cartel that violated the competition provisions of European Community (EC) law. P subsequently claimed a deduction for this payment on its 2008 Federal income tax return. R disallowed the claimed deduction under I.R.C. section 162(f), contending that the Commission is an instrumentality of the government of a foreign country within the meaning of section 1.162-21(a), Income Tax Regs.

1. Held: The phrase "government of a foreign country," as used in section 1.162-21(a), Income Tax Regs., may refer both to the

government of a single foreign country and to the governments of two or more foreign countries.

2. Held, further, the Commission is an entity serving as an instrumentality of the EC member states within the meaning of section 1.162-21(a)(2) and (3), Income Tax Regs.

3. Held, further, P's claimed deduction for the fine paid to the Commission was properly disallowed under I.R.C. section 162(f).

Allen Duane Webber, Jaclyn J. Pampel, Summer M. Austin, and Katie M. Marcusse, for petitioner.

Dennis M. Kelly, Heather L. Lampert, and Robert M. Morrison, for respondent.

OPINION

LAUBER, Judge: Following an examination of petitioner's Federal income tax returns for 2005-08, the Internal Revenue Service (IRS or respondent) determined tax deficiencies and accuracy-related penalties under section 6662(a).[1] After concessions, the remaining substantive issue concerns the deductibility of a

_____

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code in effect for the tax years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. We round all monetary amounts to the nearest dollar.

€20 million payment that petitioner made in 2008 to the Commission of the European Community (Commission).[2]  The IRS disallowed a deduction for this payment under section 162(f), which provides that "[n]o deduction shall be allowed * * * for any fine or similar penalty paid to a government for the violation of any law."  The parties have filed cross-motions for partial summary judgment on this point.

Petitioner does not dispute that the €20 million payment was a "fine or similar penalty" or that this payment was made "for the violation of * * * [a] law."  The question the parties have submitted for resolution by summary judgment is whether the payment was made "to a government."  The answer depends on whether the European Community (EC), and specifically the Commission, is an "agency or instrumentality" of "[t]he government of a foreign country" within the meaning of section 1.162-21(a), Income Tax Regs.

We hold that the term "government of a foreign country" as used in this regulation can refer to a single government or to multiple governments and thus embraces the governments of the EC member states.  We further hold that the EC,

---

[2]The parties filed a stipulation of settled issues resolving the other substantive issue, concerning petitioner's subpart F foreign base company services income.  Upon disposition of the pending motions, the only outstanding matters will be the accuracy-related penalties and computational adjustments.

and specifically the Commission, is an "instrumentality" of the EC member states considered individually and collectively. We believe these holdings to be consistent with a recent opinion of the U.S. Court of Appeals for the Second Circuit, which holds that the EC is an "agency or instrumentality of a foreign state" for purposes of the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. sec. 1603(b) (2006). See European Cmty. v. RJR Nabisco, Inc., __ F.3d __, 2014 WL 1613878 (2d Cir. Apr. 29, 2014), vacating 814 F. Supp. 2d 189 (E.D.N.Y. 2011). Concluding as we do that the €20 million fine was nondeductible under section 162(f) because it was paid to an "instrumentality" of the "government of a foreign country," we will grant respondent's motion for partial summary judgment and deny petitioner's motion.

## Background

The following facts are not in dispute and are derived principally from the pleadings, the stipulation of facts, and the related exhibits. At the time petitioner filed its petition, its principal place of business was in Michigan.[3]

---

[3]The parties submitted an extensive stipulation of facts with attached exhibits that deals comprehensively with relevant aspects of EC law. Where necessary, we have consulted resources outside the stipulation to provide a fuller picture. See Rule 146 ("The Court's determination [of foreign law] shall be treated as a ruling on a question of law."); Greene v. Commissioner, 85 T.C. 1024, 1026 n.3 (1985) (determining that the Court is not bound by the stipulations of the

(continued...)

The EC was established in 1958 pursuant to the Treaty Establishing the European Economic Community (EC Treaty).[4] The EC was created to accomplish common objectives that could not be efficiently achieved by individual action of the member states. The European Union (EU) came into existence in 1993 with the Treaty on European Union. During 2008 the EC had 27 member states and was one of several entities collectively constituting the EU, with a separate legal personhood distinct from the EU.[5]

---

[3](...continued)
parties as to matters of law); Curtis v. Beatrice Foods Co., 481 F. Supp. 1275, 1285 (S.D.N.Y. 1980) ("[F]ederal judges may reject even the uncontradicted conclusions of an expert witness and reach their own decisions on the basis of independent examination of foreign legal authorities."), aff'd without published opinion, 633 F.2d 203 (2d Cir. 1980).

[4]We cite the consolidated version of the Treaty on European Union and of the Treaty Establishing the European Community, C 321 E/1.

[5]In 2009 the Lisbon Treaty incorporated the EC, along with other European bodies, into the EU. See Treaty of Lisbon Amending the Treaty on European Union and the Treaty Establishing the European Community, Dec. 13, 2007, 2007 O.J. (C 306). The EC continued to operate as it had previously, but after 2009 it was no longer an independent entity. See Brian F. Havel & Gabriel S. Sanchez, "Restoring Global Aviation's 'Cosmopolitan Mentalité,'" 29 B.U. Int'l L.J. 1, 3 n.2 (2011) ("While some scholars have labored in the past to keep the European Union conceptually separate from the European Community, with the former referring to a geographic and political territory and the latter designating a source of law and policy, * * * [the Lisbon Treaty] abolished this distinction.").

Under the EC Treaty, shared objectives were to be implemented by the EC acting alone, by the EC and the member states sharing competences, or by the EC's undertaking to support, coordinate, or supplement actions of the individual member states. The EC Treaty defines the EC's areas of authority and limits its powers to act outside those areas. See EC Treaty art. 5. As relevant to this Opinion, the institutional framework created to implement the goals of the EC consists of the Parliament, the Council, and the Commission, along with the Court of Justice and the Court of Auditors. Id. art. 7.

The Parliament, a semi-legislative body, consists of representatives directly elected by the citizens of the member states. The Council is a legislative body composed of government ministers from each member state who are authorized to commit their respective governments. Id. art. 203. The Council exercises, jointly with the Parliament, legislative and budgetary functions. See id. arts. 161, 202. However, the Council and the Parliament generally exercise their decisionmaking power only upon the basis of a proposal from the Commission.

The Commission functions in effect as the EC's executive branch. It consists of a President from one member state, who is nominated by the Council and approved by the Parliament, and a commissioner from each other member state. The latter must be approved by the Parliament and by the Council, which appoints

each Commission member to a five-year term. Id. art. 214. Commission members are required to be completely independent in the performance of their duties, which means that they must act solely on behalf of the EC and not on behalf of any individual member state or the government thereof. Individual Commission members can be removed only for cause, by the Court of Justice upon proper application by the Council or the Commission. See id. art. 216.

To further economic unity and the goal of a well-regulated common market, the EC Treaty tasks the Commission with enforcing rules governing competition and free trade. These include rules that bar price-fixing, abusive market positions, and mergers that violate competition mandates. See id. arts. 81, 82, 85. As in effect during 2008,[6] EC Treaty article 81 restricted (among other things) actions that directly or indirectly fixed the purchase or selling prices of goods. On application of a member state or on its own initiative, the Commission was authorized to investigate cases of suspected infringement of article 81; propose measures to bring the infringement to an end; and, if the infringement continued, record the infringement in a decision. Id. art. 85. A Commission decision

---

[6]After 2008 articles 81 and 82 were replaced by articles 101 and 102. Treaty on the Functioning of the European Union, 2008 O.J. (C 115) 47.

addressing competition or free trade violations is binding upon all those to whom it is addressed. EC Treaty art. 249.

During 2008 the relationship between the Commission and the competition authorities of the member states was governed by a regulation enacted by the Council in 2002. See Regulation No. 1/2003, 2003 O.J. (L 1) 1. Under this regulation, responsibility for enforcing EC competition rules, previously exercised by the Commission alone, was shared between the Commission and national authorities. National authorities and national courts were thenceforth required to apply EC Treaty articles 81 and 82 in individual cases. Regulation 1/2003 arts. 3, 5, 6. They were also empowered to impose liability on infringing parties and decree remedies based on EC as well as national law, provided the application of national law did not prejudice the uniform application of EC rules governing competition.

Regulation 1/2003 requires the Commission and national authorities to apply EC competition law in "close cooperation." Id. art. 11(1). To achieve this goal, the regulation established the European Competition Network (ECN), consisting of the Commission and national competition agencies. Participants in

the ECN were encouraged to pool experience, share information, conduct joint investigations, and allocate resources in an efficient manner.[7]

The Commission is authorized to conduct necessary inspections, with the aid of national authorities, by entering places of business, examining books and records, and sealing business premises. Id. art. 20. Businesses are required to submit to these inspections. If a business opposes an inspection, the relevant member state is required to provide the Commission with any needed assistance, including the assistance of the state's police power.

Although Regulation 1/2003 permits national authorities to bring infringe-ment actions, the Commission has a right of first refusal to commence its own pro-ceeding. A national authority must inform the Commission in writing before

---

[7]An EC Notice issued in 2004 explained the objectives of the ECN. See Commission Notice on Cooperation within the Network of Competition Authorities, 2004 O.J. (C 101) 43:

> Together the * * * [national authorities] and the Commission form a network of public authorities: they act in the public interest and cooperate closely in order to protect competition. The network is a forum for discussion and cooperation in the application and enforce-ment of EC competition policy. It provides a framework for the cooperation of European competition authorities in cases where Articles 81 and 82 of the Treaty are applied and is the basis for the creation and maintenance of a common competition culture in Europe.

taking any formal steps toward conducting its own investigation. If the Commission does not act at that time, the relevant national authority, before issuing any decision concerning infringement, must inform the Commission of the impending decision. The Commission again has the option (rarely exercised at this juncture) to commence a proceeding of its own. The Commission's initiation of proceedings relieves national authorities of their competence to apply EC competition rules to the matter. Once the Commission issues a decision, national authorities and courts are barred from taking any action inconsistent with its decision. Id. arts. 3, 11, 16.

After beginning a proceeding, the Commission continues to share information with relevant national authorities and may consult in a collaborative manner with the Council or the Parliament.[8] Before recording a decision finding infringement, the Commission confers with the Advisory Committee on Restrictive Practices and Dominant Positions, composed of representatives of national authorities of the member states. Member states, through this committee, may have their

---

[8]"[T]he Commission would be foolish to ignore the inter-institutional context within which all European policy is made. It should come as no surprise to find, therefore, that the Commission has often encouraged parliamentary and Council involvement where formally none was necessary." Michelle Cini & Lee McGowan, Competition Policy in the European Union 44 (2009).

opinions heard, but they cannot override the Commission's decision or dictate the final outcome.

Commission decisions are ultimately enforced by national authorities. EC Treaty art. 256. National authorities are required to enforce Commission decisions with no formality other than verification of the decision's authenticity, without modifying the decision or limiting its scope. Ibid. Following this verification, the Commission can proceed to seek enforcement of its decision, in accordance with the law of the member state, by bringing the matter before the relevant national tribunal.

This case arises from an investigation that the Commission conducted of Guardian Industries Corp. (Guardian) and its wholly owned Luxembourg subsidiary, Guardian Europe S.à.r.l. (Guardian Europe). Guardian and Guardian Europe manufactured and sold float glass, fabricated-glass products, fiberglass insulation, and other building materials to customers in Europe and elsewhere. In 2004 a group of glass producers and suppliers approached petitioner with a view to discussing and agreeing on prices and price increases for glass products. The Commission suspected that these companies were fixing prices of their products and initiated an investigation into this suspected anticompetitive behavior.

In November 2007 the Commission concluded its investigation and issued a decision determining that Guardian and Guardian Europe had participated in a cartel that infringed the competition provisions of EC Treaty article 81 by fixing prices. In December 2007 the Commission notified Guardian and Guardian Europe of its decision and advised that they were jointly and severally liable for a fine of €148 million. In March 2008 petitioner paid the Commission €20 million; Guardian Europe paid the Commission €91 million; and the two companies provided the Commission a guaranty covering the remaining €37 million. Neither the payment by Guardian Europe nor the guaranty is at issue here.

Guardian timely filed its Federal income tax return for 2008. On its return Guardian deducted the payment it made to the Commission, which was $30,260,000 when converted to dollars at the relevant exchange rate. Following an examination, the IRS sent petitioner a notice of deficiency disallowing this deduction under section 162(f).

## Discussion

### I. Summary Judgment Standard

The purpose of summary judgment is to expedite litigation and avoid unnecessary and expensive trials. See FPL Grp., Inc. & Subs. v. Commissioner, 116 T.C. 73, 74 (2001). We may grant summary judgment when there is no genuine

dispute of material fact and a decision may be rendered as a matter of law. Rule 121(b); Elec. Arts, Inc. v. Commissioner, 118 T.C. 226, 238 (2002). The parties agree on all questions of basic fact and have expressed that consensus by filing cross-motions for partial summary judgment. We conclude that the question presented is appropriate for summary adjudication.

II.     Governing Statutory Framework

Section 162(a) permits taxpayers to deduct "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." Section 162(f) excepts from this general rule "any fine or similar penalty paid to a government for the violation of any law." The parties have stipulated that Guardian's payment to the Commission constitutes a "fine or similar penalty paid * * * for the violation of [a] law."[9] The parties disagree as to whether the payment was made "to a government."

The Treasury Regulations provide that no deduction shall be allowed for a fine or penalty paid to:

---

[9]Petitioner stipulated that "[i]f the Commission was an 'agency or instrumentality' of the government of a foreign country within the meaning of Treasury Regulation section 1.162-21(a), Guardian was not entitled to deduct the Payment under section 162(a)." Petitioner informed the Court that it "does not agree, in substance, that the Payment constituted the payment of a 'fine or penalty.'" But it agreed that it would not contest the Commissioner's determination that the payment should be so characterized.

(1) The government of the United States, a State, a territory or possession of the United States, the District of Columbia, or the Commonwealth of Puerto Rico;

(2) The government of a foreign country; or

(3) A political subdivision of, or corporation or other entity serving as an agency or instrumentality of, any of the above.

Sec. 1.162-21(a), Income Tax Regs. Petitioner does not challenge the validity of this regulation.

Respondent agrees that the Commission is neither "[t]he government of a foreign country" nor "[a] political subdivision" thereof. Accordingly, the question for decision is whether the Commission is an "entity serving as an agency or instrumentality" of "[t]he government of a foreign country" within the meaning of this regulation. The parties have not brought to our attention, and we have not discovered, any prior authority that addresses this question directly.[10]

---

[10]In his final summary judgment brief, respondent contends for the first time that his interpretation of the regulation is entitled to deference under Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414 (1945). We need not decide whether respondent timely advanced his deference argument or whether we would defer to litigating positions that do not derive their support from regulations, rulings, or longstanding administrative practice. See Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 212 (1988); Garnett v. Commissioner, 132 T.C. 368, 381 (2009) (citing Gen. Dynamics Corp. & Subs. v. Commissioner, 108 T.C. 107, 120-121 (1997)). As explained more fully below, we are able to decide this case in respondent's favor without according any deference to his interpretation of section 1.162-21(a), Income Tax Regs.

A.    "Government of a Foreign Country"

The Commission is required to act on behalf of the EC and its member states collectively, and it is forbidden to act in the exclusive interest of any single government. Before we examine whether the Commission is an "agency or instrumentality," therefore, we must answer the threshold question whether the term "government of a foreign country," as used in section 1.162-21(a), Income Tax Regs., embraces the plural as well as the singular.

As a general matter of statutory interpretation, "unless the context indicates otherwise--words importing the singular include and apply to several persons, parties, or things." 1 U.S.C. sec. 1 (2006). This canon of construction is fully applicable in Federal tax cases. See sec. 7701(p)(1) (referring to 1 U.S.C. sec. 1 for "[s]ingular as including plural"). This Court and other courts have invoked this principle in numerous contexts analogous to that here.

In Estate of Shamberg v. Commissioner, 3 T.C. 131 (1944), aff'd, 144 F.2d 998 (2d Cir. 1944), the question was whether interest paid on bonds issued by the Port of New York Authority, a joint agency of the States of New York and New Jersey, was exempt from tax under a statute that excluded from gross income interest on "the obligations of a State, Territory, or any political subdivision thereof." Id. at 134 (citing section 22(b)(4) of Revenue Acts of 1936 and 1938).

After concluding that the Port Authority exercised sovereign powers, the Court addressed "the final objection that * * * [it] is not a political subdivision of 'a' state but of two states, and hence falls outside the exemption." Id. at 145. We rejected this argument: "[T]he answer, as we see it, is that the Port Authority is the political subdivision of a state--the State of New York--and also the political subdivision of another State--the State of New Jersey." Ibid. The Court of Appeals for the Second Circuit, in an opinion by Judge Augustus Hand, affirmed this conclusion. See Estate of Shamberg, 144 F.2d at 1006 ("The argument that the exemption does not apply to the Authority because two states, rather than one, created the agency is far from persuasive.").

In European Cmty v. RJR Nabisco, the Court of Appeals held that the EC constitutes "the organ of a foreign state" and is thus an "agency or instrumentality of a foreign state" for FSIA purposes. 2014 WL 1613878, at *11, *14-*15 (citing 28 U.S.C. sec. 1603(b)). As Judge Leval put it: "There is no logic to the proposition that an entity that serves as an organ of one foreign state cannot also serve as the organ of another." Id. at *14. Citing 1 U.S.C. sec. 1, the court found no indication in the FSIA "that the phrase 'a foreign state' must be interpreted to exclude an organ that serves as an agency of several states." Ibid.; accord, e.g., In re Aircrash Disaster Near Roselawn, Ind., 96 F.3d 932, 938-939 (7th Cir. 1996)

(holding that an entity created by multiple governments is an "agency or instrumentality" under FSIA); Mangattu v. M/V IBN Hayyan, 35 F.3d 205, 208 (5th Cir. 1994) (same); In re EAL Corp., No. 93-cv578 (SLR), 1994 WL 828320 (D. Del. Aug. 3, 1994) (entity created by 15 European nations and responsible for European air traffic control was an instrumentality of "a foreign state" under FSIA); LeDonne v. Gulf Air, Inc., 700 F. Supp. 1400, 1406 (E.D. Va. 1988) (corporation created by treaty among four nations was an instrumentality of "a foreign state" under FSIA).

We are instructed to apply the singular-includes-the-plural canon of construction "unless the context indicates otherwise." 1 U.S.C. sec. 1; see Metallics Recycling Co. v. Commissioner, 79 T.C. 730, 738 (1982) ("[W]hether the rule of 1 U.S.C. sec. 1 is to be applied * * * depends upon congressional intent in enacting the [statute]"), aff'd, 732 F.2d 523 (6th Cir. 1984). We discern nothing in section 162(f) or the congressional intent underlying its enactment that would render this canon of construction inapplicable here.

Congress enacted section 162(f) to preclude tax deductions for civil penalties imposed for violation of U.S. or foreign law. See Hawronsky v. Commissioner, 105 T.C. 94, 97 (1995), aff'd without published opinion, 98 F.3d 1338 (5th Cir. 1996). Petitioner has stipulated that the €20 million fine was imposed for

violation of EC law. Under EC law, both the Commission and EC national authorities could investigate and sanction violations of EC Treaty articles 81 and 82. Had the Commission not proceeded against Guardian, an EC member state could have initiated a substantially identical infringement proceeding and could have imposed the same liability upon petitioner, for the same conduct, based on the same EC law. It would be an odd result, and a result plainly contrary to the statute's purpose, if a penalty imposed by one member state would be nondeductible under section 162(f), whereas the same penalty imposed by multiple member states, or an entity acting on their behalf, would qualify for deduction.[11]

Like the District Court in LeDonne, 700 F. Supp. at 1406, we decline to construe section 162(f) and the regulations interpreting it by employing an "unnecessary literalism that runs counter to * * * [their] purpose and ignores the well-established international practice of states acting jointly through treaty-created entities for public or sovereign purposes." We conclude that the

---

[11]Indeed, it is not clear to what extent petitioner disputes the application of the singular-includes-the-plural canon of construction. In its final reply brief, petitioner agrees that "[t]he Commission is not automatically disqualified as an 'agency or instrumentality' of 'the government of a foreign country' solely because the European Community was formed by more than one Member State." Petitioner hypothesizes, for example, that "an agency or instrumentality of the Latvian Government could also serve as an agency or instrumentality of the Estonian Government," provided that the entity qualified as an "agency or instrumentality" under petitioner's proposed test.

phrase "government of a foreign country," as used in section 1.162-21(a), Income Tax Regs., may refer both to the government of a single foreign country and to the governments of two or more foreign countries. As applied here, the term embraces the governments of the EC member states acting individually or collectively. Cf. RJR Nabisco, 2014 WL 1613878, at *11 ("The European Community was formed by its member nations to serve on their collective behalf * * *. We see no reason why it is not properly described as an organ of each nation."). The remaining question, and the chief focus of the parties' dispute, is whether the Commission is an "entity serving as an agency or instrumentality" of the EC member states. We turn now to that question.

B.      "Agency or Instrumentality"

Because the terms "agency" and "instrumentality" as used in section 1.162-21(a)(3), Income Tax Regs., are not defined in the statute, the regulations, or the legislative history, we employ the standard tools of construction to discern their meaning. Regulations are interpreted in the same manner as statutes. See Austin v. Commissioner, 141 T.C. __, __ (slip op. at 19) (Dec. 16, 2013) (citing Black & Decker Corp. v. Commissioner, 986 F.2d 60, 65 (4th Cir. 1993), aff'g T.C. Memo. 1991-557). In determining "the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of

the statute as a whole." K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 291 (1988); Norfolk Energy, Inc. v. Hodel, 898 F.2d 1435, 1442 (9th Cir. 1990). When a statute is ambiguous, a court must find the interpretation that "can most fairly be said to be embedded in the statute, in the sense of being most harmonious with its scheme and with the general purposes that Congress manifested." NLRB v. Lion Oil Co., 352 U.S. 282, 297 (1957).

1.    "Plain Meaning" Proposed by Guardian

Our initial inquiry is whether the language of the regulation is so plain as to permit only one reasonable interpretation of the phrase "agency or instrumentality." See, e.g., Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997). Petitioner's central argument hinges on its submission that this phrase does have a plain meaning. According to Guardian, "[t]he common sense reading of the term 'agency or instrumentality' in the context of the applicable regulatory language, and as informed by applicable dictionary definitions, demonstrates that such term encompasses only entities that act as divisions or subsidiary branches of a government." Under Guardian's proposed test, an entity qualifies as an "agency or instrumentality" of a foreign government only if it:  (1) is controlled by that government; (2) acts exclusively on behalf of that government; and (3) is subordinate to that government.  The Commission would not pass this test.

We do not agree that the phrase "agency or instrumentality" has an unambiguous plain meaning. A term is ambiguous if it is "capable of being understood in two or more possible senses or ways." Chickasaw Nation v. United States, 534 U.S. 84, 90 (2001). "Agency" and "instrumentality" are terms of considerable breadth, and they are susceptible of different meanings in different contexts. Although Guardian offered dictionary definitions showing that "agency or instrumentality" can refer to an administrative division of a government, both words are commonly used in other, less specific, senses. For example, "agency" is defined as "[t]he means or mode of acting; instrumentality"; and "instrumentality" is defined as "[a] means; an agency." American Heritage Dictionary 32, 910 (5th ed. 2011). Black's Law Dictionary 870 (9th ed. 2009) defines an "instrumentality" as "[a] thing used to achieve an end or purpose" and as "[a] means or agency through which a function of another entity is accomplished." See RJR Nabisco, 2014 WL 1613878, at *11 (Although some definitions "characterize an organ as subordinate to a larger entity," the fact that a word "is sometimes used to refer to a smaller part of a larger whole does not mean that the word can serve only in that fashion.").

Judicial precedent is hostile to the notion that the terms "agency" and "instrumentality" have an unambiguous plain meaning that dictionaries can illuminate. We have discovered at least five distinct tests that courts have employed to

determine, in various contexts, whether an entity is an "agency" or "instrumentality" of government. See Fed. Reserve Bank of St. Louis v. Metrocentre Improvement Dist. #1, 657 F.2d 183, 185 (8th Cir. 1981) (whether entity is an "agency or instrumentality" for purposes of intergovernmental tax immunity), aff'd, 455 U.S. 995 (1982); Michigan v. United States, 40 F.3d 817, 829 (6th Cir. 1994) (same); Filler v. Hanvit Bank, 378 F.3d 213, 217 (2d Cir. 2004) (whether entity is an "agency or instrumentality" for FSIA purposes); Soucie v. David, 448 F.2d 1067, 1075 (D.C. Cir. 1971) (whether entity is an "agency" for APA purposes); Groves v. United States, 533 F.2d 1376, 1383 (5th Cir. 1976) (whether entity is an "agency" for purposes of section 911(a)(1) exclusion for foreign earned income). Indeed, an entity can be an "agency" or "instrumentality" of government for one purpose but not another. Compare Gradall v. United States, 329 F.2d 960, 964 (Ct. Cl. 1963) (American Red Cross is an "instrumentality" of the United States) with Rev. Rul. 60-36, 1960-1 C.B. 279 (American Red Cross is not an "agency" of the United States for purposes of excluding foreign income from taxation under former section 911). None of these courts found the term "agency" or "instrumentality" to have a plain meaning, and none of them relied on

dictionary definitions as a reliable guide to discerning the proper interpretation of these words in context. Petitioner has cited no case in which a court has done so.[12]

Moreover, we find little merit in the definition that petitioner proposes to capture the plain meaning of these terms. If we adopted Guardian's definition of "agency or instrumentality," these words in the regulation would become superfluous. According to Guardian, an entity qualifies as an "agency or instrumentality" only if it acts as a division or subsidiary branch of a government to which it is subordinate and by which it is controlled. Under this definition, an "agency or instrumentality" equates to a "political subdivision." See, e.g., Garb v. Republic of Poland, 440 F.3d 579, 596 n.21 (2d Cir. 2006) ("political subdivision" includes all governmental units beneath the central government, including local governments).

It is a well-accepted canon of construction that a statute ought to be construed so that no clause, sentence, or word is rendered superfluous, void, or

---

[12]Petitioner cites two cases in which courts determined the meaning of "instrumentality" by applying the canon of construction "noscitur a sociis." See Edison v. Douberly, 604 F.3d 1307, 1309 (11th Cir. 2010); Green v. City of New York, 465 F.3d 65, 79 (2d Cir. 2006). These cases are inapposite; the "noscitur a sociis" canon cannot properly be applied to interpret the regulation at issue. See infra pp. 24-26. In any event, these cases show the error of petitioner's submission that the phrase "agency or instrumentality" has an unambiguous plain meaning: "Only if an attempt to discern the plain meaning fails because the statute is ambiguous, do we resort to canons of construction." Green, 465 F.3d at 78.

insignificant. See Duncan v. Walker, 533 U.S. 167, 174 (2001). The regulation at issue explicitly refers in the disjunctive to "a political subdivision," on the one hand, and to "an agency or instrumentality" on the other. See sec. 1.162-21(a)(3), Income Tax Regs. (disallowing deduction for fine paid to "a political subdivision of, or a corporation or other entity serving as an agency or instrumentality of, any of the above"). By equating "agency or instrumentality" with "political subdivision," petitioner would deprive "agency or instrumentality" of any independent meaning. We decline to adopt an interpretation of the regulation that renders a substantial portion of it meaningless. See Filler, 378 F.3d at 219-220 (rejecting plaintiffs' proposed construction of FSIA under antisurplusage canon because it would equate "foreign state" with "political subdivision," whereas statute repeatedly employs those terms in the disjunctive).

Petitioner tries to support its proposed definition of "agency or instrumentality" by relying on the canon of construction "noscitur a sociis"--a Latin phrase meaning "it is known by its associates." This canon of construction "hold[s] that the meaning of an unclear word or phrase should be determined by the words immediately surrounding it." Black's Law Dictionary 1160-1161. While "noscitur a sociis" is most commonly applied to lists of three or more terms, it may apply "when two or more words are grouped together." 2A Norman J. Singer &

J.D. Shambie Singer, Sutherland Statutory Construction, sec. 47:16, at 359 (7th ed. 2014). Because "political subdivision" appears in the same clause as "agency or instrumentality," petitioner argues that the latter phrase should be given a limiting construction that essentially equates it to the former.

This argument is unconvincing for two reasons. First, "noscitur a sociis" is properly applied to limit the scope of a potentially broad statutory term, not to render that term altogether superfluous. For example, in Jarecki v. G.D. Searle & Co., 367 U.S. 303, 307 (1961), the Supreme Court employed "noscitur a sociis" to interpret the term "discovery" as used in section 456(a)(2)(B) of the 1939 Code, which imposed tax on "[i]ncome resulting from exploration, discovery, or prospecting." Whereas "discovery" is a broad term that in other contexts can include geographical and scientific discoveries, the Court held that its association with "exploration" and "prospecting" suggested that the term, as used in this statute, had the narrower meaning of "discovery of mineral resources." G.D. Searle & Co., 367 U.S. at 307. This application of "noscitur a sociis" did not deprive "discovery" of independent meaning; it simply limited the scope of the term to one type of discovery. By contrast, petitioner's application of this canon would equate "agency or instrumentality" with "political subdivision" and thus render the former phrase superfluous.

Second, "noscitur a sociis" is typically applied to a series of coequal terms that are in a syntactically equivalent position. See, e.g., G.D. Searle & Co., 367 U.S. at 307 (applying this canon to "income resulting from exploration, discovery, or prospecting"); Green v. City of New York, 465 F.3d 65, 78-79 (2d Cir. 2006) (applying this canon to "any department, agency, special purpose district, or other instrumentality of a State"). Here, we do not have a series or list of three coequal terms. Rather, the regulation defines "government" to include "[a] political sub-division of, or corporation or other entity serving as an agency or instrumentality of, any of the above." Sec. 1.162-21(a)(3), Income Tax Regs. This is not a series to which "noscitur a sociis" is properly applied, because the syntax tells us to expect two distinct sets, not three coequal members of the same set.[13]

In sum, we conclude that subparagraph (a)(3) of the regulation does not have a plain meaning, and we reject the specific "plain meaning" definition that Guardian proposes. Because we determine the phrase "agency or instrumentality"

---

[13]For example, assume a regulation that defined a "disqualified person" to include "a family member of, or a business partner or associate of," an individual. The "noscitur a sociis" canon might properly be applied to give similar scope to the terms "business partner" and "associate." However, this canon could not properly be applied to equate "business partner or associate" with "family member." Similarly here, "noscitur a sociis" may reasonably be applied to give similar scope to the terms "agency" and "instrumentality." But this canon cannot properly be applied to equate "agency or instrumentality" with "political subdivision."

as used in this regulation to be ambiguous, we must look beyond the plain meaning and find the interpretation that makes the most sense given the context in which this phrase appears. See Lion Oil Co., 352 U.S. at 297.

### 2. A Functional Approach

Courts tasked with ascertaining whether a particular entity is an "agency" or "instrumentality" of government have found it difficult to rely on dictionary definitions. Because "it [is] clear that any general definition can be of only limited utility to a court confronted with one of the myriad organizational arrangements for getting the business of the government done," courts have generally adopted a "more functional" approach to this question. Wash. Research Project, Inc. v. HEW, 504 F.2d 238, 245-246 (D.C. Cir. 1974) (determining whether "initial review group" performing peer review on proposals for government grants was an "agency" for Freedom of Information Act purposes). "The unavoidable fact," as Judge McGowan explained, "is that each new arrangement must be examined anew and in its own context." Id. at 246. Our task is to determine the appropriate test to use in deciding whether the Commission should be regarded as an "agency or instrumentality" of the EC member states, given the context in which it operates and the legislative purpose underlying section 162(f).

We addressed a similar question in Estate of Shamberg, where we held that the Port of New York Authority, a joint agency of New York and New Jersey, was a "political subdivision" for purposes of the tax exemption for interest paid on State and local bonds.  See supra pp. 15-16.  The Port Authority was a "[m]utual endeavor * * * approved by the legislatures of the two states and Congress," designed to assure cooperation in the development of the Port of New York.  Estate of Shamberg, 3 T.C. at 132.  It was constituted by the proper authorities of each State "for the purpose of carrying out some of its public functions," id. at 141, and it was "engaged in the performance of a sovereign function of each of the states of New York and New Jersey."  Id. at 143-144 (quoting Case v. Commissioner, 34 B.T.A. 1229, 1247 (1936), aff'd, 92 F.2d 999 (2d Cir. 1937)).  We deemed it immaterial that the Port Authority lacked certain sovereign powers, such as the power to tax.  See ibid.  And we concluded that it need not necessarily exercise "an 'essential' governmental function."  Id. at 137.  Rather, we held that the Port Authority was a "political subdivision" of New York and New Jersey and that the interest paid on its bonds was exempt from Federal income tax, because it had been "delegated the right to exercise part of the sovereign power of the State."[14]

_____

[14]We noted in Estate of Shamberg that the Port Authority would also constitute a "political subdivision" under the test adopted in Little v. Williams, 231 U.S.

(continued...)

The courts have applied a similar analysis in holding that Federal Reserve banks constitute "instrumentalities" of the United States for purposes of immunity from State and local taxation. For example, in <u>Metrocentre Improvement Dist. #1</u>, the Court of Appeals for the Eighth Circuit cited Supreme Court precedent for the proposition that "a governmental instrumentality is one that performs an important governmental function." 657 F.2d at 185 (citing <u>Fed. Land Bank v. Bismark Lumber Co.</u>, 314 U.S. 95, 102 (1941), and <u>Fed. Land Bank v. Priddy</u>, 295 U.S. 229, 231 (1935)). Applying this test, the court held that the bank was an instrumentality of the Federal Government because it conducted "important governmental functions regarding the issuance of currency * * * [and] general fiscal duties of the United States." <u>Ibid.</u> The court reached this conclusion notwithstanding the "great independence" from political authority that Federal Reserve banks enjoy in performing their duties. <u>Id.</u> at 185 n.2. This test, like the test we adopted in <u>Estate of Shamberg</u>, focuses not on whether the government has plenary control over the entity, but on whether the entity exercises sovereign

---

[14](...continued)
335, 341 (1913), which held that a levee district endowed with taxing powers was a "political subdivision" where it was "a subordinate agency of the state exercising a power of the state." <u>See</u> <u>Estate of Shamberg</u>, 3 T.C. at 142. However, the principal basis for this Court's holding was that the Port Authority had been "delegated the right to exercise part of the sovereign power of the State." <u>Id.</u> at 141-142.

powers and discharges an important governmental function. See, e.g., United States v. Michigan, 851 F.2d 803, 806 (6th Cir. 1988).

In a variety of contexts, courts have stated that "[t]he authority to act with the sanction of government behind it determines whether or not a governmental agency exists." Lassiter v. Guy F. Atkinson Co., 176 F.2d 984, 991 (9th Cir. 1949).[15] Whether an entity has "the authority to act with the sanction of government behind it" seems especially relevant in the context of section 162(f). The power to impose fines and penalties is an essential attribute of sovereignty. Thus, in determining whether an entity is "an agency or instrumentality" for purposes of section 162(f), it is important to ascertain not only whether the entity has been delegated power to impose fines, but also whether it has the authority of government behind it when it seeks to collect the fine or otherwise enforce its decision. The real sting from imposition of a fine or penalty follows from the ability to collect it.

---

[15]See, e.g., United States v. Herman, 589 F.2d 1191, 1210 (3d Cir. 1978) (whether entity was an "agency" for APA purposes); Bell v. Commissioner, 278 F.2d 100, 103 (4th Cir. 1960) (whether entity was an "agency" for purposes of foreign earned income exclusion), aff'g 30 T.C. 559 (1958); Kam Koon Wan v. Black, 188 F.2d 558, 561 (9th Cir. 1951) (whether military governor of Hawaii was an "agency of the United States" for purposes of Portal-to-Portal Act of 1947); McKinney v. Caldera, 141 F. Supp. 2d 25, 32 (D.D.C. 2001) (same); Ellsworth Bottling Co. v. United States, 408 F. Supp. 280, 282 (W.D. Okla. 1975) (same).

We conclude that an entity should be regarded as an "agency or instrumentality" for purposes of section 162(f) if it has been delegated the right to exercise part of the sovereign power of a government or governments; if it performs an important governmental function; and if it has the authority to act with the sanction of government behind it. This functional test is "most harmonious with * * * [the statutory] scheme and with the general purposes that Congress manifested" when acting to disallow tax deductions for payments determined to violate public policy. See Lion Oil Co., 352 U.S. at 297.

### 3. Application to the Commission

The member states created the EC to establish "a common market and an economic and monetary union" and "to promote throughout the Community a harmonious, balanced and sustainable development of economic activities." EC Treaty art. 2. "The management of a common currency and the maintenance of economic stability are quintessential national purposes." RJR Nabisco, 2014 WL 1613878, at *12. The EC and the Commission perform an array of important government functions, including the regulation of commerce, the issuance of currency, and overseeing the fiscal affairs of the EC member states. See Metrocentre Improvement Dist. #1, 657 F.2d at 185.

The Commission acts as the executive branch of the EC.  Because a proposal from the Commission is a prerequisite for most actions by the Council and the Parliament, the Commission performs important government functions in every field in which the EC operates.  In particular, the member states conferred upon the EC and the Commission the authority to enforce laws regarding free trade and competition.  The enforcement of competition laws and the implementation of competition policy--whether by the Commission in Europe or the Federal Trade Commission in the United States--constitute important government functions.[16]

The member states and the Commission share authority for enforcing EC competition law, and national authorities are required to apply EC competition law in their own courts.  But once the Commission initiates proceedings, the member states are barred from bringing their own actions.  This makes it clear that the Commission has been "delegated the right to exercise part of the sovereign power" of the EC member states.  See Estate of Shamberg, 3 T.C. at 142.

---

[16]The United States recognizes the EC's sovereign authority over antitrust matters.  In enacting the International Antitrust Enforcement Assistance Act of 1994, Pub. L. No. 103-438, 108 Stat. 4597 (current version at 15 U.S.C. secs. 6201-6212 (2006)), Congress provided that a "regional economic integration organization" such as the EC may act as the antitrust authority for its member states.  See 15 U.S.C. sec. 6211(9); H.R. Rept. No. 103-772, at 14 (1994), 1994 U.S.C.C.A.N. 3647, 3654.

The power to impose civil and criminal penalties for violation of law is an essential attribute of sovereignty. The Commission and national authorities are authorized to impose the same types of penalties, under the same EC law, for the same types of anticompetitive behavior. Petitioner has stipulated that the €20 million penalty at issue was imposed "for violation of law." Because the Commission has been delegated final authority to impose penalties for violation of law, it clearly exercises sovereign power.

The Commission likewise has "[t]he authority to act with the sanction of government behind it." Lassiter, 176 F.2d at 991. When conducting investigations, the Commission is authorized to enter places of business, examine books and records, and seal business premises. Regulation 1/2003 art. 20. If a business opposes an inspection, the member state must provide the Commission with any needed assistance, including the assistance of the state's police power. When the Commission enters a decision, that decision must be enforced by national authorities; no formality is required other than verification of its authenticity. The Commission has the authority "to act with the sanction of government behind it" because it can impose penalties for violation of EC law, and these decisions must be enforced by the governments of all EC member states.

We conclude that the Commission is an "entity serving as an agency or instrumentality" of the EC member states within the meaning of section 1.162-21(a)(3), Income Tax Regs., and specifically that it serves as an "instrumentality" of the EC member states, because it exercises part of the sovereign power of the EC member states, performs important government functions, and has authority to act with the sanction of those governments behind it. We believe this conclusion to be consistent not only with judicial precedent in analogous areas of law, but also with the legislative purpose underlying section 162(f). Congress enacted this provision to prevent taxpayers from deducting fines or penalties paid for violation of U.S. or foreign law. The €20 million penalty at issue here was imposed and paid for violation of EC law. Given the context and statutory purpose, it makes no difference that the penalty was paid to the Commission on behalf of EC member states collectively rather than to the government of an EC member state individually.[17]

---

[17]The District Court in In re EAL Corp., No. 93-cv578 (SLR), 1994 WL 828320 at *4, reached a similar conclusion in a related context:

> Eurocontrol is charged with the regulation and governance of aviation and air traffic in its [fifteen European] Member States. * * * [But for the creation of Eurocontrol], each of Eurocontrol's Member States likely would maintain its own FAA-equivalent to perform the duties presently performed by Eurocontrol within the borders of that nation.

(continued...)

4.      Petitioner's Arguments

Guardian concedes that the €20 million penalty would be nondeductible under section 162(f) if it had been paid (for example) to the Government of France, a political subdivision of the Government of France, or a competition agency subordinate to the Government of France. In urging the opposite result here, petitioner relies chiefly on the fact that the Commission is not controlled by, or subordinate to, the government of any individual EC member state. We have already rejected petitioner's proposed definition of "agency or instrumentality" as a matter of textual interpretation. See supra pp. 20-27. We likewise find it to be unsupported by judicial precedent or common sense.

Petitioner's central argument is that an agency or instrumentality must be below a government. This argument might have appeal if we were considering whether an entity is an "agency or instrumentality" of a single known government. Guardian cites cases, for example, addressing whether a territory or possession of the United States constitutes "an agency thereof" for purposes of the foreign

---

[17](...continued)
It is beyond dispute that each such entity would be an 'agency or instrumentality of a foreign state' within the meaning of the FSIA. Formation of Eurocontrol by these sovereigns should not change this result. * * *

earned income exclusion under section 911(a) and (b)(1)(B)(ii).[18]  Because an entity serving as an "agency or instrumentality" of a single government will almost invariably be subordinate to that government, these courts logically employed a "control" test.

Petitioner's approach has less appeal when one is considering the status of an entity as an "agency or instrumentality" of multiple governments.  When sovereign states enter into a treaty to accomplish shared goals, it is rare that any signatory nation exercises unilateral control over the entities thus created.  Typically, signatories voluntarily restrict their authority to act unilaterally, as the EC member states have done, in favor of a collective regulatory scheme that they believe will serve their long-term interests.  The fact that the Commission is not subordinate to, or subject to the control of, any individual member state thus has little relevance in deciding whether it is an "agency or instrumentality" of the member states collectively.

---

[18]See Payne v. United States, 980 F.2d 148 (2d Cir. 1992) (Panama Canal Commission was an "agency of the United States").  Compare Groves v. United States, 533 F.2d 1376 (5th Cir. 1976) (Trust Territory of the Pacific Islands is an "agency of the United States"), with McComish v. Commissioner, 580 F.2d 1323 (9th Cir. 1978) (Trust Territory of the Pacific Islands is not an "agency of the United States"), rev'g 64 T.C. 909 (1975).

The precedents dealing with entities created by multiple sovereigns supports this commonsense conclusion. In Estate of Shamberg, for example, neither New York nor New Jersey could exercise unilateral control over the Port Authority, since its power was exercised by 12 commissioners, half of whom were appointed by the Governor of each State. This Court nevertheless held the Port Authority to be a "political subdivision" of New York and of New Jersey. 3 T.C. at 146. In LeDonne, 700 F. Supp at 1406, the defendant was a corporation created by a treaty among four Persian Gulf nations. No government could exercise unilateral control over the corporation because it was "owned equally by [the] four foreign states, not one which has a majority of its shares." Ibid. The court nevertheless held that the airline was an "agency or instrumentality of a foreign state" for FSIA purposes. Ibid. And in In re EAL Corp., 1994 WL 828320, at *4, the court held that an entity created by 15 nations to operate the European air traffic control system was an "agency or instrumentality of a foreign state" under the FSIA, even though it was not subordinate to, or subject to the unilateral control of, any single nation.[19]

_____

[19]As noted earlier, petitioner agrees in theory that an entity can be an "agency or instrumentality" of government even though it has been formed by more than one sovereign. See supra p. 18 n.11. However, petitioner asserts that this could be true only if that entity is controlled by, is subordinate to, and acts on behalf of each government considered separately. Petitioner cites no example of such an entity, and it is hard to understand how such an entity could function efficaciously

(continued...)

Petitioner notes correctly that the Commission, far from being subject to control by individual member states, can act in a manner contrary to a member state's wishes and interest. The Commission, for example, may investigate and fine a company resident in a member state--as it did here with respect to Guardian Europe, a Luxembourg company--over objection from that state. Petitioner also notes correctly that while member states under the EC Treaty have ultimate control over the EC and the Commission, they cannot control the day-to-day operations of either entity or dictate its conclusions concerning any particular matter.

Neither of these observations undermines the status of the Commission as an "instrumentality" of the member states. No nation joined the EC expecting that every issue would be decided in its favor. European nations joined the union because they believed that the long-term strategic benefits of membership would outweigh short-term tactical losses. In order for the Commission to constitute an "instrumentality" of the 27 member states, it is not necessary that each nation benefit equally from, or be entirely happy with, every decision the Commission makes.

Nor is the status of the Commission as an "instrumentality" of the EC member states undermined by the relative independence they have given it. The par-

[19](...continued)
in the real world.

ticular form that an entity assumes is not determinative as to whether it is an "agency" or "instrumentality" of government. See Inland Waterways Corp. v. Young, 309 U.S. 517, 523 (1940) ("[T]he form which Government takes * * * is wholly immaterial."); Lassiter, 176 F.2d at 991. The U.S. Congress has endowed various regulatory agencies with considerable independence by providing (for example) that their members can be removed only for cause and by staggering their terms so as not to coincide with election cycles. See, e.g., Humphrey's Ex'r v. United States, 295 U.S. 602 (1935). The possession of such independence does not deprive the Federal Trade Commission, the Federal Reserve Board, or the National Labor Relations Board of its status as an "instrumentalit[y] of the United States." We see no reason why a different analysis should apply to the Commission. The level of independence that member states have chosen to give to the Commission should have no relevance in deciding whether the penalties it imposes can escape the bar on tax deductibility that Congress enacted in section 162(f). Cf. RJR Nabisco, 2014 WL 1613878, at *13 (EC constitutes an "organ" of the EC member states for FSIA purposes even though member states do not "micro-manage every aspect of * * * [its] activities"); Michigan v. United States, 40 F.3d 817, 828 (6th Cir. 1994) (Education trust constituted a public agency for

purposes of intergovernmental tax immunity even though the trust was "functionally independent" of the State and "fiscally independent.").

Finally, petitioner contends that the test we have adopted proves too much. According to Guardian, if the Commission is recognized as an "agency or instrumentality" of government for purposes of section 162(f), the same conclusion would follow for "thousands of additional treaty-based entities and international organizations." Guardian notes that Congress has considered, but decided against, amending section 162(f) to provide that amounts paid to certain nongovernmental entities would be treated as paid "to a government."[20] Unless we adopt its narrow definition of "agency or instrumentality," Guardian contends, we would unjustifiably expand the scope of section 162(f) to include payments to this larger group.

Petitioner has provided no reason to believe that the nongovernmental entities it hypothesizes resemble the Commission in respects that are salient for purposes of our analysis. Petitioner has provided no evidence, for example, that such entities have been delegated sovereign powers to impose penalties, backed by the sanction of government, for violation of law. Absent such evidence, these entities could not qualify under this Opinion as instrumentalities of a foreign

---

[20]See S. 506, 111th Cong., sec. 309 (2009); H.R. 2136, 110th Cong., sec. 309 (2007); S. 681, 110th Cong., sec. 309 (2007); S. 1890, 109th Cong., sec. 2 (2005); S. 936, 108th Cong., sec. 2 (2003).

government for purposes of section 162(f). And we see little relevance in the fact that Congress has not amended section 162(f) to cover amounts paid to non-governmental entities. Our holding is that Guardian's €20 million fine was paid to a governmental entity, and is thus covered by section 162(f) as it exists, because the Commission is an "entity serving as an agency or instrumentality" of a foreign government within the meaning of section 1.162-21(a), Income Tax Regs.

C.    The Filler Test

The courts have crafted various tests for determining whether an entity constitutes an agency or instrumentality of government for purposes of different statutory regimes. In Filler, the Court of Appeals for the Second Circuit enunciated a five-part test for making this determination for FSIA purposes. In RJR Nabisco, 2014 WL 1613878, at *11-*15, the court applied the Filler factors to the EC and ruled that it is an "organ" of a foreign government and thus "an agency or instrumentality of a foreign government" within the meaning of 28 U.S.C. sec. 1603(b).

Although both parties discuss the Filler test, neither urges that we adopt it for purposes of resolving the tax question presented here. In the interest of completeness, we will nevertheless consider how this case might be decided under that approach. Applying the Filler test in the section 162(f) context, we would reach

the same result that the Court of Appeals reached in the FSIA context.  See RJR

Nabisco, 2014 WL 1613878, at *11-*15.  This result is consistent with our

analysis above.

Under the FSIA, an entity qualifies for immunity from suit in U.S. courts if

it is "an agency or instrumentality of a foreign state."  One way in which an entity

can qualify as an "agency or instrumentality" is if it constitutes "an organ of a

foreign state or political subdivision thereof."  28 U.S.C. sec. 1603(a), (b)(2).  In

Filler, 278 F.3d at 217, the court noted that "there is no specific test for 'organ'

status under the FSIA," but it mentioned five factors as relevant:

(1) whether the foreign state created the entity for a national purpose;

(2) whether the foreign state actively supervises the entity;

(3) whether the foreign state requires the hiring of public employees
and pays their salaries;

(4) whether the entity holds exclusive rights to some right in the
[foreign country]; and

(5) how the entity is treated under foreign state law.

A court balances these factors without particular emphasis on any given factor and

without requiring that every factor weigh in favor of a particular outcome.  See

RJR Nabisco, 2014 WL 1613878, at *12 ("[T]hese factors invite a balancing

process" such that "an entity can be an organ even if not all of the factors are

satisfied."); Kelly v. Syria Shell Petroleum Dev. B.V., 213 F.3d 841, 847 (5th Cir. 2000) (while the five factors "provide a helpful framework, we will not apply them mechanically or require that all five support an organ-determination").

The first factor is whether a foreign state or foreign states "created the entity for a national purpose." This inquiry closely resembles the inquiry we have made as to whether the Commission "performs an important government function." The Court of Appeals in RJR Nabisco, 2014 WL 1613878, at *12, deemed it "beyond doubt" that the member states founded the EC "for a 'national purpose.'" The first Filler factor, which we believe to be the most important for purposes of section 162(f), thus furnishes strong support for the conclusion that the Commission is an "agency or instrumentality" of the EC member states.

The second factor is whether a foreign state "actively supervises the entity," e.g., whether it regulates the entity or directs its appointments or official acts. See Peninsula Asset Mgmt. (Cayman) Ltd. v. Hankook Tire Co., 476 F.3d 140, 143 (2d Cir. 2007). The Court of Appeals in RJR Nabisco, 2014 WL 1613878, at *13, resolved this factor in favor of the EC, concluding that the member states' super-vision of the Council "enables * * * [them] to supervise the [EC's] most signifi-cant policy decisions." Although the member states do not control the details of

the Commission's regulatory activity or dictate its appointments, we reach a similar conclusion here.

Respondent admits, and we agree, that the Commission, like the EC, operated with a significant degree of autonomy; that the Commission and its members were required to act independently of their member states; and that the Parliament was not directly answerable to the governments of the member states. The Council, the body most closely controlled by the member states, lacked direct authority to appoint or remove members of the Commission. On the other hand, the member states did nominate the Commission's members and exercised ultimate control over it, defining its areas of authority and limiting its power to act outside those areas. EC Treaty art. 5. The Commission's only source of authority was the EC Treaty, which the member states retained power to amend. The fact that the relevant treaties were amended five times between 1987 and 2007 evidences the reality of that control.[21]

_____

[21]Significant amendments to the treaties include the following: (a) the Single European Act, June 29, 1987, 1987 O.J. (L l69) 1; (b) the TEU, also known as the Treaty of Maastricht, in 1993; (c) the EC Treaty, also known as the Treaty of Amsterdam, in 1997; (d) the Treaty of Nice amending the Treaty on European Union, the Treaties establishing the European Communities and certain related acts, Feb. 26, 2001, 2001 O.J. (C 80) 1; and (e) the Treaty of Lisbon amending the Treaty on European Union and the Treaty establishing the European Community, Dec. 13, 2007, 2007 O.J. (C 306) 1.

The member states did exercise some influence over Commission decisions in the competition area. The member states coordinated and cooperated with the Commission through the European Competition Network regarding investigations and decisions. This cooperation included pooling experience, conducting joint investigations, sharing information, and allocating cases and resources. During the course of investigations, the Commission often consulted in a collaborative manner with the Council and the Parliament. Before recording infringement in a decision, the Commission was required to confer with the Advisory Committee on Restrictive Practices and Dominant Positions, which was composed of representatives of national authorities of the member states. Thus, although the Commission could record an infringement contrary to the request of a member state, the member states had influence over its decisionmaking process.

For reasons adequate to themselves, the member states have chosen to exercise their supervisory authority over the EC and the Commission through a consultative and collaborative, rather than an autocratic, process. In the competition arena, this supervision is "active" in the sense that the Commission consults regularly with numerous organs of the EC and numerous representatives of the member states, all of whom have the ability to influence its decisions. Cognizant that the second Filler factor "does not require the foreign state to micro manage every

aspect of the organ's activities," RJR Nabisco, 2014 WL 1613878, at *13, we conclude that the "active supervision" factor slightly favors the Commission or is neutral here.

The third factor is whether "the foreign state requires the hiring of public employees and pays their salaries." The Court of Appeals in RJR Nabisco concluded that EC officials are "public employees" in that they exercise "powers conferred by public law and duties designed to safeguard the general interests of the state." RJR Nabisco, 2014 WL 1613878, at *13 (quoting RJR Nabisco, 814 F. Supp. 2d at 205). Similarly, the member states "indirectly pay the salaries" of EC officials, since they pay into the EC's general fund, from which those salaries are paid. Ibid. RJR Nabisco nevertheless argued that this factor disfavored "organ" status because the EC literally employs these individuals; it, not the member states, sets their salaries and cuts their paychecks.

The Court of Appeals concluded that the formal arrangements used to pay diplomatic salaries are "of small importance at best," 2014 WL 1613878, at *13, and we agree with that conclusion. If we were considering whether the Commission were an "agency or instrumentality" of a single foreign government, whether that government formally employed its officers might be a salient factor. Cf. Glencore, Ltd. v. Chase Manhattan Bank, N.A, No. 92-civ6214, 1998 WL 74294,

at *3 (S.D.N.Y. Feb. 20, 1998) (concluding that bank officials employed by the government of India were "public employees" under the FSIA). But these formal employment details seem insignificant in the present context, where we are considering whether a penalty imposed by an entity created by multiple sovereigns qualifies for a tax deduction. The salient fact is that Commission officials are public employees who exercise powers conferred by public law, including the power to impose penalties backed by the sanction of government. Like the Court of Appeals in RJR Nabisco, we regard the third Filler factor as basically neutral here and in any event as a factor that should be given little weight.

The fourth factor is whether the entity "holds exclusive rights to some right in the foreign country." The Court of Appeals in RJR Nabisco, 2014 WL 1613878, at *13, concluded that the EC holds "the exclusive right to exercise a number of significant governmental powers" in the EC member states, including the right to "authorize the issue of banknotes within the Community" and "to conclude the Multilateral Agreements on Trade in Goods." With respect to competition law specifically, the Commission has the right to conduct investigations of anticompetitive behavior within member states and to record an infringement for competition violations. This factor favors finding that the EC is an "instrumentality" of the member states.

The fifth factor considers "how the entity is treated under foreign state law." In RJR Nabisco, 2014 WL 1613878, at *14, the member states advised the District Court that they consider the European Community to be a governmental entity, and the U.S. Department of State "advised that it accepts this representation." On this basis, the Court of Appeals concluded that the EC "appears to satisfy this factor." The fact that "the member states have ceded portions of their governmental authority to the * * * [EC] to be exercised by it in their stead and on their collective behalf seems to confirm its status as an organ and agency of the member states." Ibid.

Petitioner argues that the member states do not regard the Commission as an "agency or instrumentality" below them but as a supranational body that is in some sense above them. The Court of Appeals answered this argument succinctly:

> This argument * * * depends on the proposition that a governmental entity created by a collectivity of governments * * * cannot be at once a supranational entity and an organ or agency of the actors that created it. It appears to us that both descriptions are accurate, and the fact that the * * * [EC] functions as a supranational governmental entity does not negate its also being an organ and agency of its member states, which continue to exist as sovereign nations, notwithstanding having delegated some of their governmental powers to the supranational agency they created.

2014 WL 1613878, at *14. We agree with this analysis and conclude that the fifth Filler factor supports the conclusion that the Commission, as the executive branch of the EC, is an "agency or instrumentality" of its member states.

On balance, we believe that three of the Filler factors strongly support the Commission's status as an "agency or instrumentality" of the EC member states and that the other two factors slightly favor the Commission, are neutral, or deserve little weight in the section 162(f) setting. Cognizant that these factors should not be applied "mechanically," Kelly, 213 F.3d at 847, but rather in a manner sensitive to the context, we conclude that the Commission constitutes an "agency or instrumentality" of the EC member states both under the Filler test and under the framework we have adopted. Because Guardian's €20 million fine was paid to an "agency or instrumentality" of a "foreign government" within the meaning of section 1.162-21(a), Income Tax Regs., that payment was nondeductible for Federal income tax purposes by virtue of section 162(f). We will therefore grant respondent's motion for partial summary judgment and deny petitioner's motion.

An appropriate order will be issued.